520 So.2d 778 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
Charles Hudson PRINCE, III, Defendant-Appellant.
No. CR87-97.
Court of Appeal of Louisiana, Third Circuit.
November 4, 1987.
Writs Denied February 26, 1988.
*779 Lee Gallaspy, Lafayette, for defendant-appellant.
Robin Rhodes, Asst. Dist. Atty., Lafayette, for plaintiff-appellee.
Before DOMENGEAUX, DOUCET, and LABORDE, JJ.
LABORDE, Judge.
On January 11, 1985, defendant, Charles Hudson Prince, III, was charged by grand jury indictment with second degree murder, a violation of LSA-R.S. 14:30.1. On June 2, 1985, a jury of twelve unanimously found the defendant guilty of manslaughter. Defendant requested a delay in sentencing which was granted. The court ordered a pre-sentence investigation. On August 16, 1985, defendant was sentenced to twenty-one (21) years at hard labor without benefit of probation, parole, or suspension of sentence pursuant to LSA-R.S. 14:31 and LSA-C.Cr.P. art. 893.1 and an additional two (2) years at hard labor to run consecutively *780 without benefit of parole, probation or suspension of sentence pursuant to LSA-R.S. 14:95.2. Defendant was granted an out-of-time appeal on November 24, 1986. Defendant appeals his conviction based on three assignments of error.

FACTS
The victim, Carla Bouche, also known as "Tasha", had worked as a dancer and "B" drinker in a club in Lafayette called Dillinger's. In late December of 1984, she called the owner of the lounge, Don Gautreaux, and asked him to come pick her up in Beaumont, Texas. Tasha had been fired from the club previously but wished to return to work because she feared for her life in Texas. Mr. Gautreaux drove to Beaumont, picked up Tasha and brought her to the home of Shelby Dixon (who was using the alias of Shelby Tolino while in Lafayette) and Patricia DaCosta (also known as "Ski")two employees of Dillinger's Lounge.
The next night, Tasha returned to Dillinger's and resumed her job as a dancer and "B" drinker. During the course of the evening, she became extremely inebriated and pulled a knife on some of the girls and Mr. Tolino in the dressing room. Later in the evening, Tasha threatened Mr. Tolino and had a fight with Ski. Mr. Tolino gave Ski a motorcycle timing chain which Ski used to hit Tasha. However, after the fight, Tasha was not noticeably injured.
After the lounge closed at 2:00 a.m., there was an employee's meeting and then everyone left with the exception of Mr. Tolino, Ski, Tasha, and the defendant who was employed as a bartender at the lounge. After having a few more drinks and playing pool, Mr. Tolino and Ski left in his car and the defendant and Tasha left in the defendant's car in the early morning hours of December 30. Before leaving, defendant took a shotgun case out of the trunk and placed it in the front of his car. He then told Mr. Tolino, "I'm going to take care of her."
Later that day, Tasha's body was discovered near the intersection of La. 733 and Kaliste Saloom Road in Lafayette Parish by a local resident, Kermit Steward. He immediately notified the authorities and upon examining the scene, two twelve gauge shotgun shells were found. Almost the entire brain of the victim had been blown out by one shotgun blast at close range.
Apparently, Tasha had been beaten severely before her death by a blunt instrument and suffered a broken jaw and a facial fracture. Only a few shotgun pellets were recovered from the victim's body.
After seeing news reports of the death, two local residents came forward with information. Both testified as to having seen a man and a woman standing beside a red Lincoln Continental at the intersection of Kaliste Saloom road and La. 733 early that morning. Only one of the two witnesses could identify the defendant as being one of those individuals. Each witness got the impression that the man and the woman they observed were engaged in an intense conversation, possibly arguing.
Mr. Tolino testified that around 9 or 10 a.m. on the morning of December 30, the defendant arrived at his house to return Tasha's clothes and asked Mr. Tolino to take a ride with him. The defendant told Mr. Tolino that he had killed Tasha.[1] Together, they disposed of Tasha's purse, which has never been found. Mr. Tolino stated that he threw the purse off of a bridge when told to do so by the defendant as he feared for his safety.
The next day, Detective Ben Miller went to Dillinger's to speak to the owner. He noticed a red Lincoln Continental outside matching the description of the car that was seen by the witnesses. Upon questioning Mr. Gautreaux, he learned that defendant owned the car and a twelve gauge shotgun. After the defendant was pointed out, the detective realized he matched the description of the man, and defendant was arrested. Upon his arrest, defendant was *781 advised of his Miranda rights but then made selective statements to the detective. A search warrant was obtained to search the residence of defendant's stepfather, and a twelve gauge shotgun was recovered along with boxes of shotgun shells.
Chris Henderson, the firearms expert called by the state, testified that the shotgun shells found at the scene had been fired from the shotgun found at the defendant's house. The shotgun was not examined for fingerprints due to an oily film on the surface of the shotgun, indicating it had recently been cleaned. No usable fingerprints were found on the interior or exterior of the car.
The defendant's theory of the case is that after the fight between Tasha and Ski, Mr. Tolino placed a "mickey" in his drink, rendering him unconscious. He maintains he was asleep at the bar while the murder took place, and that a conspiracy had been formed between Shelby Tolino, Don Gautreaux and Detective Ben Miller to frame him with the murder of Carla Bouche ("Tasha").

ASSIGNMENT OF ERROR NO. 1
The defense argues that the prosecuting attorney committed reversible error by using defendant's exercise of his privilege against self-incrimination to refute the defendant's trial testimony. The defense cites two instances where the prosecutor referred to the defendant's refusal to make a statement.
The first instance occurred during the direct examination of the investigating officer, Detective Miller. The exchange reads in pertinent part:
Q. And did he indicate he would talk to you?
A. Spontaneously, he held back and did not say anything; and I asked him at that point if he understood his rights, and he stated that he did understand his rights.
Q. Did you ask him any questions?
A. I asked him where was the shotgun that he had showed Mr. Gautreaux.
Q. What did he say?
A. He stated that it was at his house, and he rephrased that and said at his stepfather's house at 1002 Montrose.
Q. Did you ask him about the car?
A. Yes, sir.
Q. What did you ask him about the car?
A. I asked him if he owned the red Lincoln Continental that was parked in the parking lot.
Q. What did he reply?
A. Yes, he did.
Q. What did you do in response to that?
A. I asked if he would consent to a search of the vehicle and of the residence.
Q. What did he say?
A. No, he would not.
Q. What did you do next?
A. At that point I placed Mr. Prince under arrest. I patted him down and put the cuffs on him and put him in my car to transport to the sheriff's office.
Q. On the way to the sheriff's office did he make any other statements to you?
A. Yes, sir. I didn't ask him a direct question. He just made one (1) statement, that he had showed Tasha his car.
Q. Did he cooperate with you any further after that?
A. Once we got to the sheriff's office I read him his rights again, and he said he did not want to make any further statements.
The second exchange complained of as violative of the defendant's right against self-incrimination took place during cross-examination of the defendant by the district attorney.
Q. As a matter of fact, you got to hear everybody's testimony, Ski's testimony and Shelby Tolino's testimony, before you ever gave your statement, didn't you?
A. Their two testimonies were completely inconsistent and different. I've been telling this same story
Q. Did I ask you that?
*782 A. I've told you the same story
Q. If you would just answer my question.
A. I've told the same story since the beginning, to Alfred Boustany, to my lawyer, before I ever heard either one of those people talk. I've been telling the same story.
Q. But, see, we don't have the benefit of that, because we can't call you as a witness. I have to wait until you come forward and volunteer your story, right?
A. I've been telling the same story since the beginning.
Q. But I can't ever prove this through that, can I?
A. What was the question again?
Q. I don't know what kind of story you've been telling all along, do I?
A. You know what the first statement I made was.
Q. Yeah. The first time you made a statement to the police or the authorities you said very similar to what you said today, and that was after you had heard Tolino testify and after you had heard Patricia Dacosta testify.
A. I'm not exactly sure on that.
Q. You don't deny that, do you?
A. I'm not sure, but I know it's the same story since the very beginning.
Q. What did you mean when you told Detective Miller that all you did was show her your car?
A. I told him that I pointed at the car through the window and pointed it out to her. He asked me if Tasha had been in my car, and I said no. And he asked me did we go someplace together, and I said no. And he asked me if it was an accident that I killed her, and I said no. You know, when I told him that I wasn't going to answer anymore questions, he asked mehe drilled me for about an hour before he let me call my lawyer.
Q. At the police station?
A. Yes, sir.
Q. And you continued to answer his questions?
A. No, sir, I didn't. Some of them I did; some of them I didn't. I kept telling him I wanted to talk to a lawyer before I answered any more questions. And then when he told me he was going to tear the blank out of my step-father's house, then I told him
MR. BEARD: Would you speak up please?
A. When he told me he was going to tear the blank out of my step-father's house, then I told him that we kept the shotgun in my step-father's closet. If he would have come up and asked me what happened that night, I would have told him everything I knew; but he came up and arrested me before I said anything. And I know if you're arrested by the police and charged with a crime, that you get a lawyer before you say anything. That's what I've always been taught.
Q. So if he would have just talked to you and asked you what you knew, you would have told him everything?
A. Yes, sir. I would have told him everything I knew.
The defense argues that this evidences a deliberate intent on the part of the prosecutor to call into question the credibility of the defendant by referring to his post-arrest silence. The state argues that the first exchange between the district attorney and the investigating officer was made so as to encompass the entire investigation since defendant did make some statements after he was read his Miranda rights. With regard to the cross-examination of the defendant, the state argues that it was the defendant who pointed out that he answered some questions and refused to answer others. The state maintains that the district attorney was merely emphasizing the fact that defendant had made a statement only after hearing all the state's evidence and was therefore not trying to impeach the defendant's credibility.
It is fundamentally unfair to allow the arrested person's silence to impeach him at trial. Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976); State v. Montoya, *783 340 So.2d 557, 559 (La.1976). As the court stated in Doyle v. Ohio, supra:
"[E]very post-arrest silence is insolubly ambiguous because of what the state is required to advise the person arrested. Moreover, while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial." [citation and footnote omitted] 96 S.Ct. at 2244-2245
However, in order to raise this issue on appeal, the defense must have made a timely objection during the trial. At no point during the cross-examination of defendant by the district attorney did the defense object to the defendant being impeached by his custodial silence. Generally, the defense cannot avail itself of an error which was not objected to at the time of its occurrence. LSA-C.Cr.P. art. 841. State v. Arvie, 505 So.2d 44 (La.1987).
"One purpose of the contemporaneous objection rule is to require counsel to call an error to the judge's attention at a time when the judge may correct the error. The rule also prevents defense counsel from `sitting on' an error and gambling unsuccessfully on the verdict, and later resorting to appeal on an error which might have been corrected at trial."
Id. at 47, citing State v. Mart, 419 So.2d 1216 (La.1982).
If an error is so fundamental that it calls into question the reliability of the fact-finding process, the contemporaneous objection rule has not been applied. See State v. Williamson, 389 So.2d 1328 (La.1980); State v. Green, 493 So.2d 588 (La.1986). However, impeachment of the defendant by his custodial silence has not been held to warrant an exception to the contemporaneous objection rule. State v. Arvie, 505 So.2d at p. 48; State v. Sims, 346 So.2d 664 (La.1977). Therefore, defendant's first assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment, defendant argues the state failed to produce sufficient evidence to support the conviction of manslaughter and that the trial jury failed to adequately consider the trial court's instruction on circumstantial evidence. The defendant argues that essentially all of the state's evidence in this case is circumstantial. There were no eyewitnesses to the shooting, only one of the state's witnesses could positively identify defendant at the murder scene, the defendant owned a red Lincoln Continental and the twelve gauge shotgun that killed the victim which was found at his residence. The defense argues that the failure of the jury to return a second degree murder conviction shows that it rejected the state's direct evidence, (i.e., the testimony of Shelby Tolino) as to specific intent and the defendant's res gestae statements made on the morning of the murder.
The trial judge gave the following instruction on the evidence:
"Evidence is either direct or circumstantial. Direct evidence is evidence which if believed, proves a fact. Circumstantial or indirect evidence is evidence which, if believed, proves a fact and from that fact you may logically and reasonably conclude that another fact exists. You cannot find a defendant guilty solely on circumstantial evidence unless the facts proved by the evidence exclude every reasonable hypothesis of innocence."
LSA-R.S. 15:438 sets out the rule on circumstantial evidence: "[a]ssuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." It seems readily apparent that the trial judge was correct in his instructions to the jury.
The standard for appellate review in determining the sufficiency of the evidence is, whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 *784 (1979); State v. Edwards, 400 So.2d 1370 (La.1981); State v. Williams, 457 So.2d 902 (La.App. 3d Cir.), writ denied, 461 So.2d 313 (La.1984). When reviewing a conviction based on circumstantial evidence, it must be determined when viewing the evidence in the light most favorable to the prosecution, that a rational trier of fact could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence has been excluded. State v. Austin, 399 So.2d 158, 160 (La.1981); State v. Honeycutt, 438 So.2d 1303, 1304 (La. App. 3d Cir.), writ denied, 443 So.2d 585 (La.1983).
The circumstantial evidence test and the test of Jackson v. Virginia, supra, are not completely separate. "Ultimately, all evidence, direct and circumstantial must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden." State v. Porretto, 468 So.2d 1142, 1146 (La.1985); State v. Wright, 445 So.2d 1198, 1201 (La.1984).
The state presented the following evidence: defendant was seen leaving the lounge with the victim around 7:15 the morning the victim died, defendant and the victim and defendant's car were identified at the scene of the murder, the shotgun used in the murder belonged to the defendant and was found at the defendant's home. From the circumstantial evidence presented a rational juror could have concluded beyond a reasonable doubt that every reasonable hypothesis of innocence had been excluded.
The only hypothesis of innocence presented by the defendant was that he was sedated by a "mickey" in his drink placed there by Mr. Tolino, which caused him to sleep until the next morning around 9 a.m. or 10 a.m. He maintained that he was asleep on the couch in the office of Dillinger's when the murder took place and he has been framed for the murder by Shelby Tolino, among others. "When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant's own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt." State v. Captville, 448 So.2d 676, 680 (La.1984); State v. Ledet, 458 So.2d 1024, 1027 (La.App. 3d Cir.1984), writ denied, 462 So.2d 1263 (La.1985).
The defendant further argues that the verdict rendered by the jury reflects the jury's acquittal of the second degree murder charge and the evidence was insufficient to support a manslaughter conviction. Basically, defendant is arguing that there was no evidence in the record of sudden passion, sudden heat of blood or any provocation of the defendant. The proof of sudden heat of blood or provocation operates like a defense to first or second degree murder and therefore the state need not prove it in order to sustain a manslaughter conviction.
Guilty of manslaughter was a proper responsive verdict given to the jury for a charge of second degree murder. LSA-C. Cr.P. art. 814(A)(3). If the evidence produced at trial does not support a conviction on one of the responsive verdicts, paragraph C of Art. 814 provides a remedy:
"Upon motion of the state or the defendant, or on its own motion, the court shall exclude a responsive verdict listed in Paragraph A if, after all the evidence has been submitted, the evidence, viewed in a light most favorable to the state, is not sufficient reasonably to permit a finding of guilty of the responsive offense."
The responsive verdict of manslaughter in this case operated as a compromise between guilty of second degree murder and not guilty. It was unanimously given. The jury may return any legislatively provided responsive verdict whether or not the evidence supports that verdict, as long as the evidence was sufficient to support a conviction of the charged offense. State ex rel. Elaire v. Blackburn, 424 So.2d 246, 249 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). The evidence produced in this caseone shotgun blast at close range to the back of the victim's headwas sufficient to support a conviction of second degree murder. The verdict of manslaughter simply reflected the jury's right to compromise between the verdicts of guilty of second degree *785 murder and not guilty. The responsive verdict statute was designed to afford jurors this choice. No timely objection was made to the legislative responsive verdict, therefore the defense is precluded from seeking a reversal of the conviction since there is evidence sufficient to support the offense charged. State ex rel. Elaire v. Blackburn, supra at 248.
Defendant's assignment of error number 2 thus lacks merit.

ASSIGNMENT OF ERROR NO. 3
The defendant argues the trial court's sentence was unconstitutionally excessive and the reasons for the sentence were not adequately articulated.
Defendant was sentenced to twenty-one years at hard labor without benefit of probation, parole or suspension of sentence after being found guilty of manslaughter. Sentence enhancements were implemented by the trial judge because the crime involved the use of a firearm. LSA-C.Cr.P. Art. 893.1. Defendant was also sentenced to an additional two years under the enhancement provisions of LSA-R.S. Art. 14:95.2 also based upon the fact that the crime involved use of a firearm. Even though the defendant's sentence is within the statutory limits for manslaughter, it may still violate his right under the Louisiana Constitution against excessive punishment. State v. Sims, 410 So.2d 1082 (La.1982).
A sentence is excessive and unconstitutional if it is grossly out of proportion to the severity of the crime or if it is nothing more than the purposeless and needless imposition of pain and suffering. State v. Bonanno, 384 So.2d 355, 357 (La.1980).
In determining whether a sentence is grossly disproportionate with the severity of the crime, the court must consider the punishment and the crime in light of harm to society caused by its commission and determine whether the penalty is so disproportionate to the crime committed as to shock its sense of justice. State v. Brogan, 453 So.2d 325, 328 (La.App. 3d Cir.), writ denied, 457 So.2d 1200 (La.1984).
The trial judge noticed the particular heinous nature of the crime and that the facts were closer to second degree murder. He received letters on behalf of the defendant, the defendant's own testimony as to his non-violent nature, mitigating circumstances, and the defendant's amenability to rehabilitation.
Upon review, the court must look to see if the trial court complied with LSA-C.Cr. P. Art. 894.1. The trial judge need not list every aggravating and mitigating circumstance in Art. 894.1 that he relied upon in sentencing the defendant. The record need only reflect that he adequately considered these guidelines in particularizing the sentence to the defendant. State v. Straughter, 406 So.2d 221, 225-226 (La.1981); State v. Rainwater, 448 So.2d 1387 (La.App. 3d Cir.1984).
The record in this case reflects the trial judge adequately considered the guidelines of LSA-C.Cr.P. Art. 894.1 when particularizing the sentence to the defendant. The sentencing judge must adequately consider the defendant's personal history, any prior criminal record, the seriousness of the offense and the likelihood of recidivism or rehabilitation. State v. Soco, 441 So.2d 719 (La.1983). The record reflects the trial judge considered all these factors and complied with article 894.1.
Secondly, the defense argues that the trial judge erred in using the sentence enhancements of LSA-C.Cr.P. Art. 893.1 and LSA-R.S. 14:95.2 without giving written pre-trial notice to the defendant. LSA-R.S. 14:95.2 may not be used to enhance a defendant's sentence unless he has been charged in the indictment with a violation of LSA-R.S. 14:95.2 or with firearm use. State v. Jackson, 480 So.2d 263, 268-269 (La.1985); State v. Narcisse, 486 So.2d 349 (La.App. 3d Cir.1986). LSA-C.Cr.P. Art. 893.1, requires written notice by the prosecution prior to trial of its intent to have the article applied. State v. Jackson, supra at 269-272. Thus, if the district attorney does not act to exercise his authority timely and seek enhancement of a sentence to the full extent permitted by the law, the trial judge may not impose the provisions of either Art. 893.1 or § 14:95.2. Id. at 267.
The record reflects that the indictment did not charge the defendant with firearm use or a violation of LSA-R.S. 14:95.2. *786 Also, there was no notice given by the prosecution of its intent to use the penalty enhancement provisions of Art. 893.1. Jackson held the requirement of charging the defendant under LSA-R.S. 14:95.2 in the indictment would be afforded limited retroactive application. Thus its holding is applicable to all cases still subject to review on direct appeal at the time of its rendition. Id. at 268-269.[2] The Supreme Court later held that the written notice requirement of LSA-C.Cr.P. Art. 893.1 would also be afforded this limited retroactive application. State v. Allen, 496 So.2d 301 (La.1986).[3] Thus the trial judge's use of the sentence enhancement provisions of Art. 893.1 and § 14:95.2 without proper notice to the defendant resulted in an improper enhancement of defendant's sentence.
Accordingly, the defendant's conviction is affirmed, but his sentence is vacated and this case is remanded to the trial court for resentencing in accordance with the requirements set forth above.
CONVICTION AFFIRMED, REMANDED FOR RESENTENCING.
DOMENGEAUX, J., concurs.
NOTES
[1] As a result of conflicting testimony given to the grand jury and at a preliminary hearing to perpetuate testimony, Mr. Tolino was charged with perjury. Mr. Tolino is a convicted felon and a fugitive from justice from Texas where he is currently on probation.
[2] The trial court's decision in the case at hand was given prior to the Supreme Court's rendering of State v. Jackson. This case was subject to review on direct appeal at the time of the Jackson decision and is thus subject to its limited retroactive application.
[3] The court had previously stated in Jackson that this rule would only have prospective application. 480 So.2d at 271.