574 So.2d 448 (1991)
STATE of Louisiana, Appellee,
v.
Kenneth A. FLOWERS, Appellant.
No. 22091-KA.
Court of Appeal of Louisiana, Second Circuit.
January 23, 1991.
*449 Jones, Charles & Gilmore by Arthur Gilmore, Jr., Monroe, for appellant.
William J. Guste, Jr., Atty. Gen., James A. Norris, Jr., Dist. Atty., John Spires, Asst. Dist. Atty., Monroe, for appellee.
Before NORRIS, LINDSAY and HIGHTOWER, JJ.
NORRIS, Judge.
The defendant, Kenneth A. Flowers, was indicted for second degree murder, La.R.S. 14:30.1, in the stabbing death of Tom J. Wilson in Monroe. Flowers pleaded not guilty and proceeded to a jury trial. He was found guilty of manslaughter, La.R.S. 14:31. The trial court later sentenced him to 17 years at hard labor. He now appeals, advancing four assignments of error. For the reasons expressed, we affirm.

FACTS
Early on the morning of July 6, 1989, Monroe Police were summoned to Woodlawn Manor Apartments on Erin St. One of the occupants of downstairs apartment 122, Christopher Wade, had been awakened around 3:00 a.m. by a disturbance that sounded like a physical struggle in upstairs apartment 222, where Tom J. Wilson lived. Wade testified that he heard male voices but could not distinguish what was being said; he also heard noises like pressure being exerted on the upstairs kitchen floor. This went on for a few minutes before migrating to the front room. When Wade walked to his own front door he heard a loud bang, which he thought was a gunshot; he then called Emergency 911. Wade's brother-in-law and roommate, Scott Frost, also heard the bang, as did the apartment manager, Ms. Smith. After the *450 bang, all was quiet for a moment until Wade heard the sound of something heavily hitting the floor. Wade opened his door wide enough for him and Frost to see a black man dressed in casual clothes coming down the stairs and walking briskly toward the parking lot. The man went to a gray Mercury Cougar, fumbled with the keys and then drove off. Wade and Frost recognized the Cougar as Wilson's. Wade thought he had seen Wilson with the fleeing man the previous evening; Ms. Smith, who saw the suspect from her window, testified she had in fact seen him with Wilson in the shallow end of the apartment swimming pool a few days earlier. Wade and Frost walked into the courtyard to note the Cougar's license number.
Wade and Frost then turned and glanced up to Wilson's front door, which was open. Wilson was standing in the doorway, leaning against the frame. He was completely undressed but was holding up a pair of shorts or sweatpants as if for decency. Wade and Frost bounded up the stairs to assist him but he fell down just inside the doorway, mumbling incoherently. Wade and Frost pulled him further into the living room and laid him flat; they noticed he was badly cut in the chest area. Frost fetched a blanket from Wilson's hallway and covered him. Wade went to the phone to call for help but found it was not working. The cord had been cut. The first officer to arrive, Sgt. Otwell, noticed that Wilson had several stab wounds in the back as well as the chest.
Emergency medical personnel arrived and attempted to revive Wilson en route to St. Francis Medical Center but were unsuccessful. He was pronounced dead on arrival at 3:39 a.m.
Officers who investigated the scene found evidence of violent acts. There were several bloodstains in the apartment, mostly on the living room carpet near the kitchen door. Another stain appeared to be "wiped" toward the center of the living room, as though something had been dragged across the rug. There was also a bloody handprint on the wall; an X-rated video was playing in the VCR.
Wilson's car was found at a department store parking lot a few blocks away; the keys were not in it. Officer Gregory processed the car for fingerprints and found those of the defendant, Kenneth Flowers, on the door handle. These findings led police to search for Flowers. The keys to Wilson's car were later found on the roof of the department store.
Dr. George McCormick, who performed the autopsy, found that Wilson died from 17 stab wounds: three in the front, upper chest (which, according to Dr. McCormick, incapacitated him) and then 14 scattered on the back, apparently inflicted in a frenzy. Because the stab marks were randomly distributed Dr. McCormick felt they stemmed from an argument arising from a sexual or homosexual relationship. He also found numerous sperm on the foreskin of Wilson's penis and occasional sperm in the rectum. Although he could not estimate how long the sperm had been present, he surmised that Wilson had recently engaged in rectal intercourse with a second party.
Tim Whitney, the charge nurse at the emergency room, testified that the EMTs had fitted Wilson with MAST trousers, inflatable pants used to boost a trauma victim's blood pressure. The MAST trousers were not removed from Wilson's body until after the emergency room doctor declared him DOA. When Nurse Whitney removed the MAST trousers he noticed a strong fecal odor. He found fecal matter not in Wilson's rectal area but on his penis and pubic area. Though Whitney is not trained in analysis of the substance, he considered it a "moderately gross" amount of "fresh" feces.
Lieutenant Brown, who had also investigated the crime scene, interviewed Flowers on July 24. According to Lt. Brown, Flowers gave an initial oral statement in which he admitted going with Wilson into the apartment and finding a man and woman there on the floor watching an X-rated video. Flowers told Lt. Brown that he left the apartment, went down to Wilson's car and waited for him to return; when he did not, Flowers simply walked off. There *451 was no violent confrontation and Flowers did not drive Wilson's car. Later, after some questioning, Flowers retracted this statement and gave an recorded statement substantially similar to his trial testimony.
At trial, Flowers testified that after 2:00 on the morning of July 6 he had left one bar and was walking along Renwick Street to go to a disco when Wilson, driving a blue 1984 Cougar, pulled up and asked him where he was going; Wilson offered him a ride, which Flowers hesitantly accepted. Both the disco and another bar they went to were closed. Wilson, who by this time had introduced himself to Flowers, said he knew of another place they could go but first he had to run by his apartment to get something. Flowers went into the apartment with Wilson and drank a beer; Wilson put a porno tape in the VCR and went to his bedroom for a few minutes. When he returned, he was "buck naked" and Flowers suddenly realized his host was gay; Flowers testified the only thing he wanted to do was "get out." He ran to the door but found it bolted shut. Wilson charged toward him and knocked him against the door. Flowers tried to "knock the daylights out of him," but Wilson was much larger and a struggle ensued. They exchanged blows, fell to the floor and wrestled around. Flowers grabbed a small knife from the kitchen table. When Wilson again pinned him down and cupped his hand over Flowers's mouth, Flowers stabbed him in the shoulder. Wilson rose but still would not let Flowers out; the fight continued, and Flowers stabbed him several times in the back. Wilson finally staggered and fell with a loud crashing sound. Instead of fleeing, Flowers scouted around the apartment for Wilson's car keys and then drove off in Wilson's car. He also admitted he cut the phone wire because he was "confused" about the incident. He did not know what happened to the knife. He did not tell anyone about the incident because he "didn't know how."
Flowers insisted he had never seen Wilson before this incident and had never been his guest in the swimming pool, but admitted he had noticed Wilson's car cruising the neighborhood. He also admitted that at no time during the struggle did Wilson ever arm himself or wrest the knife from Flowers's grasp. He resolutely denied that he ever engaged in homosexual activity.
Flowers's brother testified that Flowers does not know how to swim. The defense also called three witnesses to testify that Wilson had approached and propositioned them for homosexual acts in the past. The court heard this evidence out of the jury's presence, ultimately ruling that specific acts of homosexual advances by Wilson to third parties were not admissible to attack his character.
The state called rebuttal witnesses who testified as to Wilson's gentle, nonviolent character. As noted, the jury convicted Flowers of the lesser included offense of manslaughter.

CHARACTER EVIDENCE
By his first assignment Flowers urges the trial court erred in refusing to let him introduce evidence of specific acts to show the victim's homosexual tendencies and habits. Flowers contends that the excluded evidence would show that Wilson was in the habit of offering a young man a ride, taking him to his apartment and making aggressive sexual advances toward him.
Flowers correctly argues that evidence of the victim's dangerous character or threats against the accused are relevant to self-defense because such evidence shows that the victim was the aggressor and that the defendant reasonably apprehended the danger. State v. Edwards, 420 So.2d 663 (La.1982); La.C.Ev. art. 404 A(2). In cases of self-defense, the burden rests with the state to disprove the defense. State v. Garcia, 483 So.2d 953 (La. 1986). The defense brief recaps the proffered evidence in an effort to show that Wilson really was the aggressor and that Flowers's apprehension was reasonable and justified his conduct.
The problem with the argument is that Wilson's sexual orientation was not an issue at trial and is not relevant to the *452 defense of self-defense. La.R.S. 14:20 provides in part:
§ 20. Justifiable homicide
A homicide is justifiable:
(1) When committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger[.]
The proffered evidence showed that Wilson was homosexual but it gave no indication whatsoever that he was dangerous or violent. Two of the witnesses, Stevenson and Webster, testified that Wilson drove up and propositioned them; when they turned him down, he just drove off. The third witness, Gibson, merits further discussion. This surprise witness "volunteered" to testify after reading about the case in the newspaper and sitting in on part of the trial. He related an incident strikingly similar to Flowers's. Gibson accepted the ride and they stopped by Wilson's apartment; there Wilson made his pass. Gibson declined. Notably, Wilson put up no violence but actually gave Gibson another ride, dropping him off at a restaurant. This evidence would show, as the state conceded at trial and in brief, that Wilson was homosexual. It would not show that he had a dangerous character or made any threats against Flowers. Flowers, in fact, always maintained that he never spoke with Wilson until this very incident. The proffered evidence was not relevant to the defense of self-defense. C.Ev. art. 404 A(2); R.S. 14:20(1).
Even if the proffered testimony had been relevant, it would not satisfy the codal requirements for character evidence. Under C.Ev. art. 405, a person's character must usually be proved by reputation, not specific acts. No attempt was made to lay the proper foundation that the witnesses were familiar with Wilson's reputation; in fact Flowers testified he himself was unaware of it, suspecting nothing sexual until Wilson emerged naked from the bedroom. Article 405 does provide for the admission of specific instances of conduct but only when a character trait is an essential element of a charge or defense, such as in a prosecution for defamation or in the defense of entrapment; the exception does not apply here. Evidence as to Wilson's general reputation would have been admissible but Flowers offered only testimony about specific acts. This testimony was inadmissible and the trial court did not err in excluding it.
Flowers finally argues that the evidence was admissible under C.Ev. art. 406 as a habit or routine practice. A habit or routine practice is very specific and must be nearly invariable and semi-automatic. See C.Ev. art. 406, Author's Note (1); McCormick on Evidence § 195 (3d ed. 1984). Testimony as to three similar but unidentical acts does not rise to the level of a habit or routine practice.
This assignment lacks merit.

SPECIAL JURY CHARGE
By his third assignment Flowers urges the trial court erred in denying his request for special jury charges regarding circumstantial evidence. La.C.Cr.P. art. 807 provides in part:
A requested special jury charge shall be given by the court if it does not require qualification, limitation or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
In brief Flowers correctly argues he was entitled to an instruction that in a case involving circumstantial evidence, the jurors must be satisfied that the overall evidence excludes any reasonable hypothesis of innocence. La.R.S. 15:438; State v. Sutton, 436 So.2d 471 (La.1983). Jury charges must be considered as a whole. State v. Motton, 395 So.2d 1337 (La.), cert. denied sub nom. Motton v. Louisiana, 454 U.S. 850, 102 S.Ct. 289, 70 L.Ed.2d 139 (1981). In reviewing jury charges the court of appeal must consider whether any potential ambiguity in the trial court's charge on circumstantial evidence was harmless error. State v. Davis, 541 So.2d 831 (La.1989).
*453 The trial court defined reasonable doubt and instructed the jury as to the state's burden of proof. R. p.p. 116-117. The court then charged the jury as follows:
Evidence is either direct or circumstantial. Direct evidence is evidence which, if believed, proves a fact. Circumstantial or indirect evidence is evidence which, if believed, proves a fact, and from that fact you may logically and reasonably conclude that another fact exists.
You cannot find a defendant guilty solely on circumstantial evidence unless the facts proven by the evidence exclude every reasonable hypothesis of the defendant's innocence. R. pp. 118-119.
Flowers has not pointed out what element of the state's case was affected by this jury charge or how it would have changed the verdict. The biggest difference between Flowers's proposed charge and the court's charge is that the latter expresses the rule as "solely" on circumstantial evidence. We have therefore considered whether the charge might have misled the jury into thinking that the standard of proof under R.S. 15:438 cannot apply in a case based partly on circumstantial and partly on direct evidence. We do not find this charge to be misleading or an incorrect statement of the law. The instant case was composed not only of circumstantial evidence but direct evidence such as the oral and recorded statements, eyewitness accounts, the expert medical testimony and the cross examination of Flowers. The court's charge, when taken as a whole, does not distort the rule that assuming every fact to be proved that the evidence tends to prove, in order to convict, the circumstantial evidence must exclude every reasonable hypothesis of innocence. R.S. 15:438. In cases of this nature, the identical charge has been repeatedly upheld by other courts. See State v. Jones, 535 So.2d 3 (La.App. 4th Cir.1988); State v. Prince, 520 So.2d 778 (La.App. 3d Cir. 1987), writ denied 522 So.2d 567 (1988); State v. Wiggins, 518 So.2d 543 (La.App. 5th Cir. 1987), writ denied 530 So.2d 562 (1988). It has also been inferentially approved by the Supreme Court. See State v. Davis, supra. The instant charge, taken as a whole, is not a misstatement of the law.
This assignment does not present reversible error.

SUFFICIENCY OF EVIDENCE
By his second assignment Flowers urges the evidence was insufficient to sustain his conviction for manslaughter and to exclude his claim of self-defense.
When a defendant in a homicide case claims self-defense, the state has the burden of establishing beyond a reasonable doubt that he did not act in self-defense. State v. Garcia, supra. A homicide is justifiable when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger. La.R.S. 14:20(1). On review, the standard is whether a rational fact finder, after viewing the evidence in light most favorable to the state, could have found beyond a reasonable doubt that the homicide was not committed in self-defense or defense of others. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Matthews, 464 So.2d 298 (La.1985); State v. Johnson, 553 So.2d 865 (La.App. 1st Cir. 1989), writ denied 558 So.2d 600 (1990).
Credibility determinations are largely within the jury's province. State v. Trosclair, 443 So.2d 1098 (La.1983). The appellate court will accord great discretion to the jury's decision to accept or reject the testimony of a witness or defendant. State v. Mussall, 523 So.2d 1305 (La. 1988); State v. Holland, 544 So.2d 461 (La.App. 2d Cir. 1989).
Manslaughter is defined in part as a homicide which would be first or second degree murder but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. La.R.S. 14:31(1). The verdict of manslaughter is responsive to the charge of second degree *454 murder. La.R.S. 14:29; C.Cr.P. art. 814 A(3).
In brief Flowers stresses his own testimony and argues that his acts were unintended as he was merely trying to "get away from" Wilson. The simple fact that Wilson sustained 17 stab wounds will belie, we feel, any argument that this was an "unintended" act. Flowers further argues that his conduct was justifiable to protect himself from Wilson's violent advances. Flowers's own version of the incident, however, is of such a quality that the jury could find it suspect. First of all, Wilson never armed himself; this would hardly seem to justify the fierce barrage of 17 stabs. Flowers said that the only thing he could think of was to get out, and yet after knifing Wilson front and back, he lingered to cut the phone cord, search for Wilson's keys and steal the car, none of which seems consistent with self-defense. Flowers's first statement to the police denied any violence with Wilson on that night, but he retracted this. The jury could also have accepted Mrs. Smith's testimony that Wilson entertained Flowers in the apartment swimming pool days before the stabbing, and rejected Flowers's contention that he never knew the man. When compared with the physical evidence, Flowers's story falters even more. Despite his denial of homosexual involvement with Wilson, Dr. McCormick's and Nurse Whitney's findings strongly suggest that Flowers and Wilson engaged in anal intercourse shortly before the stabbing. Dr. McCormick further testified that the stab wounds in the back were probably inflicted from behind and after Wilson was incapacitated. Finally there was the character evidence as to Wilson's nonviolent temperament.
Viewing all the evidence in light most favorable to the state, a rational fact finder could have found beyond a reasonable doubt that Flowers did not act in self-defense but killed the victim in a heat of blood caused by provocation sufficient to deprive an average person of his self control and cool reflection. See State v. Garcia, supra; State v. Edwards, supra; State v. Waxler, 569 So.2d 29 (La.App. 4th Cir. 1990); State v. Prince, supra.
This assignment does not present reversible error.

EXCESSIVE SENTENCE
By his fourth assignment Flowers urges his 17-year sentence is unconstitutionally excessive. He also argues the trial court erred in failing to consider some unspecified mitigating factors.
The test of excessiveness is two-tiered. First the record must show the trial court took cognizance of the sentencing guidelines of La.C.Cr.P. art. 894.1. The court is not required to list every factor as long as the record shows it adequately considered them. State v. Smith, 433 So.2d 688 (La. 1983). The goal of art. 894.1 is a factual basis for sentence, not a rote recitation of guidelines. The important elements to be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Hudgins, 519 So.2d 400 (La.App. 2d Cir.), writ denied 521 So.2d 1143 (1988).
The court noted the salient facts that Flowers was 23 years old, unmarried and not a father; had an eighth-grade education and attended technical school for a while; worked construction; and was a first felony offender. The biggest mitigating factor was that Flowers led a relatively law-abiding life until this incident. The court also acknowledged a number of favorable letters from Flowers's family and friends. The biggest aggravating factor was the gravity of the offense, as the victim's life cannot be restored. Flowers has not pointed out, and we do not perceive, any other relevant mitigating factors. The trial court's compliance was adequate.
The second tier is constitutional excessiveness. A sentence violates La. Const. art. 1 § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than purposeless and needless imposition of pain and suffering. State v. Bonanno, *455 384 So.2d 355 (La.1980). A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, the sentence shocks the sense of justice. State v. Hogan, 480 So.2d 288 (La.1985). The trial court has wide discretion in imposing a sentence within statutory bounds and such a sentence should not be set aside absent a manifest abuse of discretion. State v. Square, 433 So.2d 104 (La. 1983); State v. Hudgins, supra.
The trial court noted that a short sentence would deprecate the seriousness of the crime, and appropriately so, as the crime resulted in the loss of a well respected school teacher. On the other hand, Flowers's clean prior record counseled against a maximum sentence. We perceive no abuse of discretion in the balancing process that set this sentence at 17 years. It does not shock our sense of justice. This assignment does not present reversible error.
We have also reviewed the record for error patent and find none. La.C.Cr.P. art. 920(2).
The conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED.