LANDRIEU, Judge.
We are asked to review the proceedings in the trial court in the case of a double homicide, for which the defendant has pled self-defense as justification. Concluding that the trial court erred in failing to give instruction to the jury in the matter of circumstantial evidence, we reverse defendant’s conviction in this case and remand for a new trial.

FACTS AND PROCEDURE:

On December 7, 1990, at 8:19 p.m. the police operator received a call of a disturbance at 926 Esplanade Avenue, New Orleans. The caller identified himself as “Mark.”[1] An officer, Maxie Walker, was not *900 dispatched, however, until 9:27 p.m., and he arrived within minutes. When Walker went to the door of the residence, which he found ajar, he could see a man on the floor of the hallway. At that time, Louis K. Hawthorne, the defendant, called to Walker from the neutral ground, and, with hands raised, said “I did it, officer. I shot them both.” Walker arrested the defendant, handcuffed him and advised him of his rights. The defendant then told him that he had thrown the gun used in the shootings in a storm drain at the corner, where it was later recovered. He claimed he left the house to call a friend, David Lovelle, from a nearby Circle K, with the gun in hand, and threw it in the drain because people on the street were frightened.
In the house, Walker found Danny Hall dead in the hallway. This victim was wearing a bath robe, and his left hand was in the pocket of his robe. One .25 caliber casing and one .25 caliber live bullet were found next to Hall. Mark Gegenheimer was found dead on the floor of the bedroom, known as the Marie-Michelle Room, in a space between the bed and the far wall. Three .25 caliber casings were located in the vicinity of this victim. Another officer testified that the telephone in the room where Gegenheimer was found was off the hook. According to pictures of the crime scene, the base of the telephone appeared to be on the bed and the cord, which led to the handset, appeared to run down the side of the bed opposite Gegen-heimer’s body. The defendant testified that, after the shootings, he tried to put the telephone back on the hook. However, he claimed that the receiver got caught in the bed, and the cord pulled out of it.
According to Hawthorne’s statement to police[2] and his trial testimony, Danny Hall, described as his business partner and lover,[3] came to the apartment at 5:45 p.m. on that date, and the two men had drinks. They began discussing their business, Hawthorne House, a bed and breakfast establishment.[4] When the defendant confronted Hall about missing money, an argument ensued. During dinner at a local restaurant, they continued the argument, and Hall asked the defendant how much money he wanted for his share in the business. The defendant responded, “at least $100,000.” Hall then said, “I’ll kill you. You don’t get a free ride.” The defendant threatened that if he did not “get what [he] deserved David [Lovelle] [had] a lien against the house.”
Lovelle had designed and decorated the renovation to the guest house, known as Hawthorne House. The defendant testified *901 that although he was supposed to receive 50% of the income from the house and he was aware that the business was taking in a lot of money, neither he nor Lovelle was ever paid. When defendant called the bank, he learned that Hall routinely had made withdrawals from the corporate account for his personal use shortly after deposits were made. Furthermore, defendant saw a stack of certified checks written on that account, as Hall’s mother, who resided in Tennessee, was leaving after a visit. The checks had been cashed and represented Hall’s personal transactions. Therefore, in early December, Lovell and the defendant decided to take legal action against Hall. Lovell called the defendant at 6:00 p.m. on the night of the crime to tell him that an appointment with a lawyer had been scheduled and that he planned to place a lien on the house.
After the defendant and Hall returned to the house from the restaurant, the defendant overheard an apparent call by Hall to his mother in Tennessee during which he told her, “You were right. He was after my money all the time.”[5] When he hung up the telephone, Hall contacted Marc Gegenheimer, a former employee and ex-convict, and asked him to come over. Gegenheimer arrived as the defendant made the 911 call. The defendant claimed that Hall struggled with him for the telephone; that Gegenheimer started to take off his shirt to assist, but Hall told him, “Don’t hurt him now;” and that he thereafter relinquished the telephone. Left alone in the Desire Room, adjacent to the Marie-Michelle Room, without keys which Hall had taken from the table, the defendant claimed to hear doors slamming throughout the house. Closed doors at Hawthorne Manor could not be opened without a key.
Subsequently, Hall and Gegenheimer went into the Marie-Michelle Room and closed the door. The defendant stated he heard Hall tell Gegenheimer he wanted the defendant dead that night. To arm himself, the defendant described how he went out the back door of the breakfast area that opened into the Desire Room and, from there, into an office on the third floor. He knew that Hall kept several guns in the office, but these weapons were missing.[6] He located a semiautomatic handgun, a Titan .25, used by Hall’s mother during her stay, which defendant had hidden behind a vase.
Back on the first floor and armed with the handgun, the defendant claimed that Hall rushed him and grabbed him by the throat with one hand. When Hall turned his head to call Gegenheimer,[7] the defendant shot him at close range. Defendant further testified that Gegenheimer then ran out of the Marie-Michelle Room, where he had been talking on the telephone. Although the defendant claims that he pointed the gun at him and told him to get out, Gegenheimer ran back into the Marie-Michelle Room, where the defendant allegedly thought he was going to get from under the bed one of the missing rifles. The defendant followed Gegenheimer into the bedroom and fired three times at him.
Autopsies were performed by Dr. Tom Carson, a pathologist. He said Hall died of a bullet which entered the left rear side of his head and exited through the right. The injury to the brain stem would have resulted in instantaneous death. Gegenheimer suffered a wound to the left shoulder but died of a *902 wound to the head. Gegenheimer’s blood alcohol level was .09%. Hall tested negative for alcohol or other drugs.
Dr. Paul MeGarry, forensic pathologist for the Coroner’s Office of Orleans Parish, said that Hall was shot from behind or at least with his head turned away from the shooter. He said that, as to Gegenheimer, the shooter had to have been shooting down at the victim.
Dr. Irving Stone, of the Institute of Forensic Sciences in Dallas, an expert in firearms identification, gunshot residue and wound ballistics, said he found blood on the weapon suggesting that it was fired within six or eight inches of one or both victims. Although he did not type the blood to determine whether it was Hall’s or Gegenheimer’s, Stone testified that the blood splatter could be consistent with someone shooting at close range. He stated he had never seen a self-defense case where the victim was shot either from behind or from a downward angle.
The defense also offered testimony of witnesses concerning the defendant’s alleged fear of the victims and of guns. Shirley Bruce testified that, having met the defendant through Lovelle, she had known him for eight years prior to the shooting. According to her testimony, the defendant told her he was afraid of Gegenheimer because he believed that Gegenheimer had killed people[8] and because guns were kept in the house. She said she knew the defendant to be afraid of guns. David Lovelle also testified that the defendant hated the presence of guns in the house. The defendant himself related that Hall told him of a confrontation with another business associate who had accused him of cheating. According to the defendant, Hall said that he fired his gun at the associate and killed his pet canary with a bullet to its head.
However, Cynthia Williams, a housekeeper at Hawthorne Manor who saw the defendant find the checks, testified that he told her, “please, my God, don’t tell I found this. I’ll kill you. Please don’t.” According to her testimony, the defendant was “stoned” and crying when he threatened her about the checks and was holding a gun the entire time.
On January 31, 1991, the defendant was charged by grand jury indictment with two counts of first degree murder for having the specific intent to kill or inflict great bodily harm on more than one person. La.Rev. Stat.Ann. § 14:30 (West 1986). He was arraigned February 14, 1991 and pled not guilty. On May 7, 1992 a twelve member jury found him guilty of second degree murder on count one as to victim Danny Hall, and guilty as charged on count two as to victim Mark Gegenheimer. The jury recommended life imprisonment as to count two. On June 19, 1992, the trial court sentenced him to two concurrent terms of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. He filed a motion for appeal that day.

ERRORS PATENT:

Our review reveals no errors patent.

ASSIGNMENT ONE AND TWO:

In pertinent part, La.Code Crim. Proc.Ann. art. 801 (West Supp.1993) provides, “The court shall reduce its charge to writing if it is requested to do so by either a defendant or the state prior to the swearing of the first witness at the trial on the merits.... The court shall deliver a copy thereof to the defendant and to the state prior to reading it to the jury.”
Although its request was timely made, the defense claims that a written copy of the proposed jury instructions was not received prior to the charges being read to the jury. At the close of arguments, the defense counsel objected that he had not been given written charges. The trial judge nevertheless proceeded with his instructions, which by his own admission did not include a charge on circumstantial evidence “because he did not think [one] was required.” Therefore, counsel for the defendant was unable to urge that an instruction on circumstantial evidence be given, and he claims that the defendant was *903 prejudiced because the State’s ease relied on circumstantial evidence.
At some point during the instruction, the trial judge’s law clerk gave defense counsel copies of the relevant pages from the judge’s charge book. When the defense counsel reiterated his objection after the charge was complete, the trial judge called the law clerk to the stand. Under oath, the clerk explained that the trial court had indeed ordered him to prepare written charges, and that he had done so. He stated that he placed the charges on the defense table prior to the judge’s reading of instructions, when all parties were in a conference in the judge’s chambers, but conceded that he did not verbally inform counsel the charges were on the table. Nevertheless, he said they were noticeable because of an attached yellow memorandum. Although the law clerk claimed to have given a copy to the trial judge, he said he did not remember whether the State had asked for one or whether he had delivered it. The ADA later testified that he had neither requested nor received the charges. Furthermore, on comparing the belated charges delivered to him to the transcript of charges read, defense counsel complains that they were neither accurate nor given to him in the correct order.
Although compliance with the mandatory language of the relevant article is disputed, that is, whether or not a copy of the written charge was delivered to the defendant prior to reading it to the jury, reversal on that basis alone would not be warranted unless the written charges as read were inadequate. In this regard, defense counsel argues the court did, in fact, err by not including a circumstantial evidence charge.
Pursuant to La.Rev.Stat.Ann. § 15:438 (West 1992),
The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.
The standard for an appellate review of the sufficiency of evidence to support a conviction requires a determination that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Although the Supreme Court in. State v. Porretto, 468 So.2d 1142, 1146 (La.1985), concluded that § 15:438 does not establish “a purely separate test from the Jackson standard,” that Court has also held that a “merger [of the Jackson constitutional standard and the circumstantial evidence rule] does not appear to promote clarity but could lead to a distortion of the standards .... [A]n in-tandem articulation may seem improperly to diminish the requirement of the circumstantial evidence rule by implying that, in a close case, this court will defer to the jury’s finding rather than follow its own determination of whether there is a reasonable hypothesis of innocence. Although in many instances separate and dual applications of the rules will yield the same result, out of an abundance of caution we will proceed to apply each standard separately.” State v. Shapiro, 431 So.2d 372, 385 (La.1983). Accordingly, the Court has held that “the defendant in a circumstantial evidence case has a statutory right to an instruction in the trial court that the jurors must conclude that no reasonable hypothesis of innocence exists, as well as a constitutional (and statutory) right to be convicted only upon proof of guilt beyond a reasonable doubt.” State v. Jacobs, 504 So.2d 817, 819 (La.1987) (citing In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970)).
In this case, the only issue litigated was whether the defendant, Louis “Kenny” Hawthorne, killed Danny Hall and Marc Gegen-heimer in self-defense. These homicides would be justifiable if the defendant reasonably believed that he was in imminent danger of losing his life or receiving great bodily harm and that the killing was necessary to save himself from that danger. La.Rev.Stat. Ann. § 14:20 (West 1986). Since the defendant raised this affirmative defense, it is the State’s burden to disprove it. State v. Flowers, 574 So.2d 448, 451 (La.App. 2d Cir.1991), writ denied 580 So.2d 666 (La.1991) (citing State v. Garcia, 483 So.2d 953 (La.1986)). Much evidence in that regard is circumstantial, that is, it is proof of facts or circum *904 stances from which one might infer or conclude the existence of related facts. State v. Austin, 399 So.2d 158, 160 (La.1981).
It is undisputed that no circumstantial evidence charge was given to the jury in this case. We find that the absence of this evi-dentiary guide for the jury when considering circumstantial evidence is error.[9]
In view of our decision on these assignments of error, we pretermit discussion of the defendant’s remaining complaints of error in the trial court proceedings.
Defendant’s conviction and sentence are reversed. The case is remanded for further proceedings.
REVERSED AND REMANDED.
WALTZER, J. concurs with reasons.

. Tony Scaturro, electronics division NOPD, identified a 911 tape recording of calls from 926 Dauphine between 8:00 p.m. and 9:00 p.m. The tape was played for the jury.
Thomas Wagner, who knew the defendant, as well as Hall and Gegenheimer, listened to the tape. Wagner interpreted the voice to say "there was a disturbance and he needed police to 936 Esplanade.” The dispatcher asked for the call *900 er's identity and the caller said "Mark Gegen-heimer.” The tape ended with the sound of footsteps and the voice saying, "yes, ma'am, I ...” Wagner said the call made at 8:19 p.m. was the voice of the defendant. John Crowder also said he knew all three men and that the call for help was from the defendant. He said the naming of the name "Mark Gegenheimer” was done by the defendant. Although Dexter Ford, a friend of the defendant since high school, did not know the other men, he identified the voice on the tape as that of the defendant.
The defendant himself explained that his attention was divided between who was coming into the house and what was being said on the telephone at the time. With the phone held away from his head, furthermore, he could not hear clearly and responded to the operator's question with the name of the one who had been called to the house, that is, Marc Gegenheimer.

.Kitty Watson, an expert in "talking, listening and taking down communications,” testified that the statement taken by Detective Wayne Tambo-rello suggested that it was a summaiy of what the defendant had said. She said some of the statement would necessarily have been omitted or distorted.

. Mary Kriegal testified that the defendant and Hall often drank and fought, and were unhappy at times. She did not know whether the fights were over love or money. She said in the weeks before the killings, the defendant left Hall to stay with David Lovelle. Hall convinced him to return only twelve days before he was killed. Ronald Morvant, another witness, agreed that the defendant and Hall had a violent history. And, in response to one of their arguments, Hall changed the beneficiary on his life insurance policies from the defendant to his mother in the weeks before the shooting, according to Hall's attorney.

. Frederick Burkhardt, Hall’s attorney, testified Hall paid $220,000 of a $243,000 purchase price in cash when the property was purchased in January of 1990. He set up two corporations, one in which Hall and his mother owned equal shares, although a counter letter was executed stating that Hall actually owned all the shares. This corporation was the owner of the real estate. The other corporation was set up to operate the guest house, and the defendant owned a portion of that corporation.

. Eugenie Tillman, staff manager for South Central Bell, testified that two calls were placed to Hall’s parents' phone number in Tennessee on the night of the crime, at 8:23 p.m. and 8:53 p.m. Ralph Hall, Hall’s father, testified his son called him forty minutes before he died. According to Mr. Hall, he sounded nervous and said that the defendant was presenting problems to him. Mr. Hall then talked to Gegenheimer who told him that he would "knock [the defendant] on his ass,” if he caused any trouble.

. Ronald Morvant testified that he worked at Hawthorne House in the middle of 1990. While there, he saw three guns, a sawed off shotgun, a rifle, and a pistol in the house: one under the bed on the second floor, one on the side of the bed in a desk, and one by the door.

.At the time of the altercation between the defendant and Hall in the hallway, Gegenheimer was talking on the telephone with Donna Brown. She testified at trial that she heard the defendant and Hall arguing. After Gegenheimer told her to hold on a minute, he returned to the phone and said, "Call the police. These dickheads in here are killing me.”

. Mary Kriegel testified that she too had heard Gegenheimer say "I have a cemetery. I have enough people in a cemetery." A similar claim was made by Gegenheimer on the evening of the shootings. He allegedly said to the defendant, "I have two cemeteries full now; one more won’t make any difference.”

. We believe that a previous decision of this court in State v. Walters, 582 So.2d 317 (La.App. 4th Cir.1991), writ denied, 584 So.2d 1171 (La. 1991), is distinguishable from the instant case. In Walters, the non-circumstantial facts precluded any possibility of a reasonable hypothesis of innocence and rendered an instruction on circumstantial evidence irrelevant to the jury’s task.