NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-594

STATE OF LOUISIANA

VERSUS

MICHAEL BUSHNELL SR.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTEENTH JUDICIAL DISTRICT COURT
PARISH OF EVANGELINE, NO. 78262-F
HONORABLE JOHN LARRY VIDRINE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

J. DAVID PAINTER
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Marc T. Amy, Elizabeth A. Pickett, and J. David Painter, Judges.

AFFIRMED WITH INSTRUCTIONS.

G. Paul Marx, Attorney at Law
Louisiana Appellate Project
P. O. Box 82389
Lafayette, LA 70598-2389
COUNSEL FOR DEFENDANT-APPELLANT:
    Michael Bushnell, Sr.

Trent Brignac, District Attorney
Julhelene E. Jackson, Assistant District Attorney
Thirteenth Judicial District
P. O. Drawer 780

Ville Platte, LA 70586
COUNSEL FOR THE STATE OF LOUISIANA

Michael Bushnell, Sr., Pro Se
Louisiana State Prison
Falcon - 3
Angola,, LA 70712
COUNSEL FOR DEFENDANT-APPELLANT:
    Michael Bushnell, Sr.

**PAINTER, Judge.**

Defendant, Michael Bushnell, Sr., appeals his conviction on the charge of second degree murder, a violation of La.R.S. 14:30.1. For the following reasons, we affirm his conviction with instructions to the trial court to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received said notice.

## FACTS AND PROCEDURAL HISTORY

On April 20, 2009, in the course of a dispute at his home, Defendant fired a shotgun three times at his eldest son, Scott, who was nineteen years old. Evidence presented at trial indicated that the first was a warning shot into the front doorjamb. The second shot grazed Scott's head from back to front, and the third shot struck him in the upper back. Medical testimony demonstrated that the third shot transected the victim's spine, killing him.

The dispute between father and son arose because Scott wanted to remove items, belonging to his younger brother, from the residence.[1] Defendant's wife, Debra, was living elsewhere with the couple's two younger children, and Scott slept in a shed behind Defendant's residence. At trial, Defendant took the stand and recounted the incident in detail. However, he stated that he did not remember firing the second shot and did not remember shooting Scott in the back. Scott had called his mother, and she heard the gunshots over the phone.

On June 1, 2009, an Evangeline Parish grand jury indicted Defendant for second degree murder, a violation of La.R.S. 14:30.1. Defendant entered a plea of not guilty; however, the trial court later allowed him to change his plea to not guilty by reason of insanity. The trial court also granted Defendant's motion for a sanity hearing, and, following that hearing, the trial court found that Defendant was

---

[1]Defendant testified that Scott also wanted "the checkbook."

competent to stand trial. Defendant then announced that he intended to argue that the homicide was justifiable.

A jury found Defendant guilty as charged. The trial court denied Defendant's motion for new trial and sentenced him to life imprisonment without benefit of probation, parole, or suspension of sentence. Defendant now seeks review of his conviction. He assigns three errors through counsel, and a fourth *pro se*.

## DISCUSSION

### *Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find that there is one error patent in that the record before this court does not indicate that the trial court advised Defendant of the prescriptive period for filing post-conviction relief as required by La.Code Crim.P. art. 930.8. Therefore, the trial court is directed to inform Defendant of the provisions of Article 930.8 by sending appropriate written notice to Defendant within ten days of the rendition of this opinion and to file written proof in the record that Defendant received the notice. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

### *Sufficiency of the Evidence*

In his counsel-filed brief, Defendant argues that the verdict should have been manslaughter because the evidence showed provocation sufficient to impair Defendant's judgment and did not establish that his "blood had cooled at the time of the shooting."

Defendant was convicted of second degree murder. This offense is defined by La.R.S. 14:30.1, which states, in pertinent part, that: "[s]econd degree murder is the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" Manslaughter is:

[a] homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

Louisiana Revised Statutes 14:31(A)(1).

The elements of "sudden passion" and "heat of blood" are mitigatory factors in the nature of a defense, and when such factors are established by a preponderance of the evidence, a verdict for murder is inappropriate. *State v. Leger*, 2005-0011 (La.7/10/06), 936 So.2d 108; *State v. Deal*, 2000-0434 (La.11/28/01), 802 So.2d 1254, *cert. denied*, 537 U.S. 828, 123 S.Ct. 124, 154 L.Ed.2d 42 (2002). Provocation and time for cooling are questions for the jury to be determined under the standard of the average or ordinary person, one with ordinary self-control; if a man unreasonably permits his impulse and passion to obscure his judgment, he will be fully responsible for the consequences of his act. *State v. Leger*, *supra*, and citations therein.

*State v. Baker*, 41,555, p. 5 (La.App. 2 Cir. 8/15/07) 962 So.2d 1198, 1202, *writ denied*, 07-1833 (La. 4/25/08), 978 So.2d 363.

Defendant testified that on the night of the offense, he had gone to sleep on the couch at approximately 9:00 p.m., but Scott awakened him by kicking his feet. Scott then addressed him in coarse language, demanding various items such as "the checkbook," a book sack, and school clothes. Defendant further testified that Scott was not normally in the residence (a trailer) at night. Scott then went to a table and started eating and repeatedly "looking at his arm as if he had a watch telling me time is running out." According to Defendant, he called 911 when Scott went to the bathroom. Scott began behaving more calmly, so when a 911 dispatcher called back, Defendant stated that he needed no assistance. As soon as Defendant hung up, he alleges that Scott told him "you gonna die tonight," left the house, went to his car, then went to a padlocked shed and started beating on it. Defendant testified that Scott had been able to knock the padlock open in the past and that there was a shotgun in that shed. Thus, Defendant went to his bedroom and retrieved a shotgun he kept there.

3

According to Defendant, Scott re-entered the residence, uttered more threats, and then ran out again. Defendant fired a warning shot that struck low on the front doorjamb, but Scott again entered the trailer "trying to get the gun." Defendant testified that he walked backwards and "the gun went off." Defendant then called 911, possibly twice, then called his wife "and asked her why did she send Scott [the victim] to raise hell with me."

Debra Bushnell, who was Defendant's wife and the victim's mother, testified that on April 20, 2009, she was living at a women's shelter in St. Martinville with her two younger children. Scott was nineteen years old and living with Defendant. On the morning of April 20, she checked her voice messages and found that her middle child, Quinton, had called her. She called him to find out why he was not in school, and the boy replied that Defendant had signed him out. A few minutes later, she received a call from Defendant demanding that she deliver their youngest child, Mya, to him. After that call, Quinton called again to ask her to bring Mya. She agreed to do so once Mya had finished school for the day. However, Defendant called again, yelling over the phone. After Debra hung up, Quinton called again and said that he was scared. He told her that Defendant was going through his book sack and asking questions about the shelter where they were staying. She advised Quinton to get out of the house as soon as he could. She then called Defendant's next-door neighbor and asked her to give Quinton a ride. The neighbor agreed to help. In the meantime, Defendant called Debra again and was still angry. By that time, Debra was scared, so she checked Mya out of school. Once she secured Quinton, she began to drive the children back to the shelter in St. Martinville. Quinton was barefoot, having left his shoes at Defendant's residence.

Debra then received a call from her cousin, Lisa Fontenot, who advised her that Defendant was at the Fontenot residence. Lisa told Debra that Defendant would not let Lisa or her children leave until Debra brought Quinton and Mya to him. Debra

drove by her cousin's residence and deputies were present, but she did not stop because Defendant was in the yard. A deputy tried to flag her down, and then followed her in a squad car. When she stopped, the deputy asked her to come back to her cousin's property. Once they arrived, a deputy asked each of the children whether they wanted to go to Defendant. Each replied in the negative. At Debra's request, she and her two youngest children received an escort out of town. Quinton's testimony generally corroborated Debra's account of the events involving him. Lisa's testimony corroborated the testimony regarding Defendant's barging into her house and demanding that Debra bring the children to him. The testimony indicated that at one point, Defendant stated, "[N]obody is going to leave this damn house and somebody will die today."

Debra testified that a little after 9:00 p.m., Scott called her to find out what was going on. Scott told her that Defendant had called him. In reply, Debra recounted the day's events to her eldest son. She asked him to pick up Quinton's shoes and book sack at Defendant's trailer so that Quinton would be able to attend school the next day. Debra also testified that shortly before 10:00 p.m., she noticed that she had two missed calls and a text from Scott's number, so she called him back. He asked her to talk to Defendant, and then said, "put the gun down, put the gun down." She described his tone as "pleading." Next, she heard three shotgun blasts. The physical evidence at the scene also indicated that there were three shots, and the medical testimony showed that two of them struck the victim, Scott.

The only issue before this court is whether the verdict should be reduced to manslaughter. Defendant claims that there was sufficient provocation to reduce the verdict because the victim told him that he was going to die that night and because of earlier violent incidents between them. He specifically refers to an incident in 2007, another in 2008 and also to a threat the victim made in 2007. Defendant also notes his own "final determination not to take a beating or be threatened with death again."

Our review reveals that the record clearly demonstrates that the Bushnells had a troubled family history that included threats and violence. In an earlier incident involving a dispute about an air compressor, Defendant apparently struck Scott over the head, and Scott retrieved the shotgun and twice shot it into the ground near Defendant. As Defendant retreated, Scott fired a third shot and uttered a threat. On the night at issue, Defendant may well have subjectively felt anger or alarm. However, it is questionable whether the provocation was sufficient to reduce the verdict, given that Defendant shot his unarmed son in the back with a shotgun.

In *State v. Theard*, 527 So.2d 393 (La.App. 4 Cir.), *writ denied*, 533 So.2d 372 (La. 1988), the court held "sudden passion" or "heat of blood" was not shown, as the defendant shot the unarmed victim in the back as he fled a bar after an argument between them.

In *State v. Mack*, 435 So.2d 557 (La. App. 1 Cir.), *writ denied*, 440 So.2d 727 (La.1983), the defendant sought an acquittal for second degree murder, based on self-defense, but in the alternative he sought a reduction to manslaughter. The court rejected the argument, in part because he shot the unarmed victim in the back. The *Theard* and *Mack* courts each had the benefit of eyewitness testimony. In *Mack*, witnesses saw the defendant pursue the victim before the last shot. Discussing an apparent compromise verdict of manslaughter, this court stated, "The evidence produced in this case - one shotgun blast at close range to the back of the victim's head - was sufficient to support a conviction of second degree murder." *State v. Prince*, 520 So.2d 778, 784 (La.App. 3 Cir. 1987), *writ denied*, 522 So.2d 567 (La. 1988).

Even if jurors believed that at some point during the incident, the victim was "trying to get the gun" as Defendant testified, the verdict of second degree murder was reasonable. Scott was unarmed, shot in the back, his body was found face-down on the front steps of the trailer, and medical testimony indicated that he would have

6

dropped immediately upon having his spinal cord transected. Scott's mother heard him pleading with his father to put the gun down before Defendant fired.[2] Under these circumstances, we find that Defendant has failed to demonstrate passion or heat of blood sufficient to reduce the verdict to manslaughter. Thus, this assignment lacks merit.

*Louisiana Code of Evidence Article 404*

Defendant argues that the trial court erred in admitting evidence of his marital problems. He argues that issues between the parents were immaterial in this case, which was a violent incident involving him and his son. Defendant cites La.Code Evid. art 404, which states, in pertinent part:

> B. Other crimes, wrongs, or acts. (1) Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
>
> (2) In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.

The State replies that the evidence at issue was a form of *res gestae*, citing language from the supreme court:

---

[2] Defendant notes that the 911 transcript of Debra's call does not include any statement that the victim was begging or pleading. Rather, it indicates that she stated that the men were fighting. The assessment of such evidence was a matter of weight and thus within the province of the jury.

This Court has long approved of the introduction of other crimes evidence, both under the provisions of former R.S. 15:448 relating to *res gestae* evidence and as a matter of integral act evidence under La.C.E. art. 404(B), "when it is related and intertwined with the charged offense to such an extent that the state could not have accurately presented its case without reference to it." *State v. Brewington*, 601 So.2d 656, 657 (La.1992). This doctrine encompasses "not only spontaneous utterances and declarations made before and after commission of the crime but also testimony of witnesses and police officers pertaining to what they heard or observed before, during, or after the commission of the crime if the continuous chain of events is evident under the circumstances." *State v. Molinario*, 383 So.2d 345, 350 (La.1980). We have required a close connexity between the charged and uncharged conduct to insure that "the purpose served by admission of other crimes evidence is not to depict the defendant as a bad man, but rather to complete the story of the crime on trial by proving its immediate context of happenings near in time and place." *State v. Haarala*, 398 So.2d 1093, 1098 (La.1981) (emphasis added); see also 1 *McCormick on Evidence*, § 190, p. 799 (4th ed., John William Strong, ed., 1992) (other crimes evidence may be admissible "[t]o complete the story of the crime on trial by placing it in the context of nearby and nearly contemporaneous happenings.") (footnote omitted). The *res geaste* [sic] or integral act doctrine thus "reflects the fact that making a case with testimony and tangible things not only satisfies the formal definition of an offense, but tells a colorful story with descriptive richness." *Old Chief v. United States*, 519 U.S. 172, 186, 117 S.Ct. 644, 653, 136 L.Ed.2d 574 (1997). The test of integral act evidence is therefore not simply whether the state might somehow structure its case to avoid any mention of the uncharged act or conduct but whether doing so would deprive its case of narrative momentum and cohesiveness, "with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict." *Id*.

*State v. Colomb*, 98-2813, pp. 3-4 (La. 10/1/99), 747 So.2d 1074, 1075-76.

The present offense clearly grew out of a pre-existing state of domestic dysfunction within the Bushnell family. Apparently, there were prior threats and prior acts of violence by both parties. The matter presents a classic *Old Chief/Colomb* scenario in which the State had to present evidence of Defendant's prior actions in order to coherently present its case.

At the time of his arrest, and in trial testimony, Defendant claimed that Scott had physically beaten him in some prior incident or incidents. Thus, evidence of such incidents was relevant to Defendant's claim at trial that he shot his son in self-defense, or alternatively, that he shot his son in response to provocation. As Defendant states

in his brief, "This very typical manslaughter situation, with anger and threats, had to be addressed for trial purposes by showing something else." To support his case, Defendant elicited evidence that on previous occasions, Scott was violent, particularly toward him. Therefore, the State's evidence to refute this point or to show that Defendant was violent or threatening on prior occasions was clearly relevant and probative.

Some discussion of the family's troubled history is necessary to clarify the current analysis. At trial, Defendant acknowledged telling an arresting officer that Scott "beat me to a pulp," apparently in some prior incident. This testimony was corroborated by Sergeant Shane Guillory of the Evangeline Parish Sheriff's Office, who stated: "He advised me that him and his son had got into an argument and he shot him, and he said his son had beat him to a pulp at one time[;] he was not going to allow it again."

Also, Defendant recounted an incident in May 2007, in which he and Scott argued over the use of an air compressor. He testified that he hit Scott over the head with a shovel, then Scott ran into the trailer and secured the shotgun. When Scott emerged from the trailer, he fired into the ground near Defendant's feet. As Defendant went to a neighbor's residence to call police, Scott fired into the air. Debra testified that she was aware of the incident; apparently Defendant had told her about it. However, she claimed that Defendant had broken the shovel over Scott's head. Lieutenant Adam Fruge of the Evangeline Parish Sheriff's Office also testified about the incident, as he was dispatched to the scene. He spoke to Defendant at the scene and to Scott at the hospital.

The difficulties between father and son arose from the difficulties facing the entire family, as revealed by Debra's testimony. Debra testified that she had been married to Defendant for twenty-two years; at the time of the trial, they were still married but living apart. Much of the family's situation on the day of the shooting

was discussed in the previous assignment, as it was logically connected to the offense. Further, Debra testified that approximately one month prior to the offense, Defendant threatened their children's lives. The episode, in which the threat occurred, like other events in the family's history, indicates that the offense at issue did not arise in isolation.

Debra had driven to a bank with her two younger children to make a deposit. Defendant drove up in his truck, in which Scott was a passenger. Defendant entered the bank and became irate because he mistakenly thought that his name was not on the account. While the adults were in the bank, the two younger children apparently got into the truck with Scott. Debra then went to buy a car for Scott. She testified that Defendant called her on her cell phone, stating that "he could end it for all four of them." This frightened her, since he had their three children with him. In addition to the *Old Chief/Colomb* rationale, this sort of evidence was relevant to assessing Defendant's intent or state of mind.

In other testimony, Debra acknowledged that on a prior occasion she was at a friend's house, and Scott arrived unexpectedly. He was irate because he had not been able to reach her by cell phone. Scott pushed her, and she called the sheriff's office. She testified that Scott cried and apologized.

Under cross-examination, Debra recounted various incidents in which Scott had been involved. Once, he had driven to see friends in Jennings when he was supposed to be going the store and coming back home. On another occasion, he kicked the door to their shed because he wanted to ride a four-wheeler that was locked in it. Also, Debra testified that in September of 2008, Scott missed his National Guard drill because he had gone hunting with a friend, Brent Zachary, and not returned home.

Defense counsel asked both Debra and Yvette Jones, Scott's girlfriend, about whether Scott had made threats against Brent. While Yvette denied knowledge of any such threats, Debra testified that Defendant told her that Scott was angry because he

thought Zachary might have impregnated Yvette and that Scott wanted to "go after Brent." Debra testified that Defendant told her that Scott was trying to get into the shed, or at least punched the shed, but she denied that the shed contained guns at that time. We can find no testimony by a witness with direct knowledge that Scott threatened Zachary. The matter did not arise during Defendant's testimony.

Debra also testified that Scott called her in January of 2009 to tell her that Defendant was suicidal. Defendant called her himself to tell her the same thing; he had left a hospital in Lake Charles without being discharged. The testimony regarding this incident was elicited by Defendant's trial counsel during cross-examination.

Further, the parties appear to agree that Defendant and Scott were having no problems earlier on the day of the offense. As noted, this tragic offense arose in part out of Defendant's actions regarding his younger children and his wife. He checked his other son out of school early and later tried to force Debra to deliver his daughter to him. When the shooting occurred, Scott was trying to retrieve his younger brother's shoes and school books. Logically, the offense at issue was connected to the events earlier that day. In turn, those events arose from the family's troubled history.

Also, Quinton testified that in 2004, Defendant beat Scott for accidentally scratching his truck. Debra's brother, Gillis Goodley, testified that in January 2009, Defendant threatened to kill Debra and the children if they moved to Maryland to stay with Gillis. Such evidence could have been construed to negate Defendant's self-defense argument at trial as well as the provocation/manslaughter argument he made at trial and repeats on appeal.

In summary, evidence regarding domestic disturbances within the Bushnell family was admissible under the *Old Chief/Colomb* rationale. Clearly, the current offense did not occur in isolation. It grew out of previous domestic strife in the family. The evidence is also relevant to intent, as Debra's testimony indicated that Defendant had threatened to kill all his children on a prior occasion. This assignment lacks merit.

11

## Exclusion of Testimony from Defense Psychologist

Defendant argues that the trial court erred in barring evidence from a defense psychologist since he had pled not guilty and not guilty by reason of insanity and had shown evidence of mental illness. However, the plea announced to the jury after the reading of the bill of indictment was a standard "not guilty," with no mention of insanity. Defendant argues that he had a due process right to try to establish that he was mentally incapable of distinguishing right from wrong.

However, at trial, Defendant's stated basis for trying to use the testimony of a psychologist was "to explain the dynamics of a dysfunctional family, which we have here." Defendant then proffered the psychologist's report, which appears to address his general state of mind and its possible bearing on his actions on the night of the offense. Thus, Defendant presents a different basis for the admission of the psychologist's testimony than the basis he argued at trial. Uniform Rules—Courts of Appeal, Rule 1-3, states, "The Courts of Appeal will review only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise." We find that the interest of justice does not require that this issue be analyzed. Defendant tried to present the evidence at issue on an entirely different basis, and there is no logical reason to allow him to re-litigate its admissibility under a new theory. Thus, we will not consider this assignment of error.

## Pro Se Assignment of Error

In his pro se brief, filed in the form of a letter, Defendant alleges that a number of witnesses, including Debra, committed perjury. In his supplemental pro se brief, he argues that his protective order against Scott "contradicts the testimony of Debra Bushnell's [sic] where she testified and painted her son as an innocent child." In a note filed on September 13, he again alleges that several witnesses lied on the stand.

It is not the role of the appellate courts to second-guess the weight and credibility assessments made by fact-finders at trial. Also, the pro se brief does not present any legal argument or cite any evidence. Defendant merely lists page numbers and the names of witnesses and alleges that they lied at trial. He also refers to the protective order, and the application for it is included in his supplemental brief. However, a temporary restraining order was entered into the evidence at trial. Thus, the jury was aware that the protective order existed, although the constable who was asked about it did not remember serving it. Furthermore, as the jury heard the evidence discussed in the first and third assignments of error, it was aware that the victim was not, generally speaking, "an innocent child."

We find that Defendant's pro se submissions contain no basis for re-assessing the weight or credibility of Debra Bushnell's testimony or that of any other State witness and that this assignment lacks merit.

## DECREE

For all of the foregoing reasons, Defendant's conviction on the charge of second degree murder is affirmed. However, the trial court is hereby instructed to inform Defendant of the provisions of La.Code Crim.P. art. 930.8 by sending appropriate written notice of correct prescriptive period of the filing of post-conviction relief within ten days of the rendition of this opinion and to file written proof in the record that Defendant received said notice.

**AFFIRMED WITH INSTRUCTIONS.**