NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

11-1458

STATE OF LOUISIANA

VERSUS

S. R.

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
THIRTY-FIFTH JUDICIAL DISTRICT COURT
PARISH OF GRANT, NO. 10-221
HONORABLE WARREN DANIEL WILLETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

JOHN D. SAUNDERS
JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Billy Howard Ezell, and Phyllis M. Keaty, Judges.

AFFIRMED.

James Patrick Lemoine
District Attorney, 35th Judicial Disctrict Court
P. O. Box 309
Colfax, LA 71417-0309
(318) 627-3205
COUNSEL FOR PLAINTIFF/APPELLEE:
    State of Louisiana

**Beth Smith Fontenot**
**Louisiana Appellate Project**
**P. O. Box 3183**
**Lake Charles, LA 70602**
**(337) 491-3864**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **S. R.**

**Renee W. Dugas**
**Assistant District Attorney, 35th Judicial District Court**
**P. O. Box 309**
**Colfax, LA 71417**
**(318) 627-3205**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**SAUNDERS, J.**

On April 9, 2010, the Grant Parish Grand Jury indicted Defendant, S.R., with two counts of indecent behavior with juveniles, in violation of La.R.S. 14:81. Defendant's trial on those charges began with jury selection on March 21, 2011, and continued through March 23, 2011. Following presentation of the evidence and the argument, the jury found Defendant guilty as charged.

Thereafter, on June 23, 2011, the sentencing court imposed seven years at hard labor on each count; ordered the penalties to run concurrently; designated that the first two years of the sentence for the second count would be served without benefit of probation, parole, or suspension of sentence; credited Defendant for time served; and directed Defendant to pay costs of court.

Defendant filed a motion to reconsider sentence, and on August 11, 2011, the district court conducted a hearing on that motion. After considering the evidence and argument presented, the trial court denied Defendant's motion to reconsider sentence.

Defendant now appeals his conviction and sentence. We affirm Defendant's convictions and sentences.

**STATEMENT OF FACTS:**

At trial, the State called fourteen-year-old Elizabeth Delaney to testify as its first witness. At the time of trial, Elizabeth had known M.W.,[1] the victim, for three years. They were in sixth and seventh grades together. Elizabeth and M.W. were friends. They slept over at each other's houses. Elizabeth knew S.W., M.W.'s mother, and Defendant. Defendant lived with S.W., M.W., and J.R. J.R. was the

---

[1] Initials are being used in the instant case to protect the identity of the victims in accordance with La.R.S. 46:1844(W).

daughter of Defendant and S.W.; J.R. was M.W.'s half-sister. J.R. was about six years younger than M.W. who, at the time of trial, was thirteen.

Elizabeth recalled M.W. talking to her about something that made M.W. uncomfortable. The conversation occurred in August 2009 when they were walking up and down M.W.'s road. M.W. told Elizabeth that she was not really comfortable with Defendant, because he had sexually abused her. M.W. did not go into detail about the abuse. M.W. was upset when she made the statement; she acted as if she had not ever been able to speak about it before. M.W. related that the abuse had happened on more than one occasion. M.W. was not a very open person; Elizabeth only had an inkling about what M.W. was going to say when the topic arose, because Elizabeth had observed that M.W. acted like she was uncomfortable around Defendant. Elizabeth also felt uncomfortable around Defendant, but she thought it was because she did not really know him.

Elizabeth remembered that M.W. told her that Defendant had used his hand to abuse her sexually. Defendant touched M.W. on her breasts and between her legs in the area covered by underwear. M.W. did not specify whether Defendant touched her beneath or over her underwear.

Elizabeth stated that, the next time M.W. told her about the abuse, the girls were at Elizabeth's house. The topic came up when M.W. said that she did not want to go home, because Defendant was in the house when she got home after school. M.W. stayed with Elizabeth for three to four days. M.W. was crying, scared, and really upset; she did not want to go home, because she did not want the abuse to happen again. Elizabeth's mother, Tracey Delaney, may have overheard the conversation. Elizabeth instructed M.W. to tell S.W., M.W.'s mother, and told M.W. that if she did not tell S.W. then Elizabeth would tell S.W. Once Mrs.

Delaney overheard the conversation, M.W. related the same basic story to her. Mrs. Delaney also instructed M.W. to go home and tell her mother.

Elizabeth said that, when she spoke to M.W. on the telephone a couple of weeks later, M.W. still had not told her mother. Elizabeth again threatened to tell S.W. if M.W. refused, so M.W. told her mother that day. Elizabeth had not seen any of the abuse, though she had witnessed Defendant hug M.W. in an "affectionate" manner that was not similar to what a father would give his daughter. The hugs Elizabeth saw Defendant give M.W. seemed similar to what a boyfriend would give his girlfriend.

Mrs. Delaney was the State's second witness. Mrs. Delaney knew M.W. as one of her daughter's school friends. M.W. stayed at the Delaney residence quite a bit; they lived near M.W.'s home. Elizabeth also stayed overnight at M.W.'s house. Mrs. Delaney thought M.W. lived with her mother, father, and sister. She assumed at the time that Defendant was M.W.'s father. Mrs. Delaney overheard crying, so she went to see what was going on. When she saw that it was M.W. crying, she assumed that M.W. was probably crying because she was homesick and wanted to go home. Mrs. Delaney asked M.W. what the trouble was, but at first, M.W. did not say anything.

Mrs. Delaney said that Elizabeth asked to speak to Mrs. Delaney outside of the room. Once out of the room, Elizabeth explained about what had been going on. Mrs. Delaney was shocked and really did not know what to do, so she went back into the room and asked M.W. if she wanted Mrs. Delaney to call S.W. for her or if M.W. wanted Mrs. Delaney to take her home. M.W. did not want to go home, because she was scared of Defendant, whom M.W. called her "step-dad." M.W. told Mrs. Delaney that S.W. did not know what had been happening and that

M.W. did not want S.W. to find out. M.W. said Defendant had molested her while her mother was at work over the summer.

Mrs. Delaney asked M.W. if, maybe, he was just hugging her. Mrs. Delaney had doubts at first because M.W. was really jealous of J.R. However, M.W. said that it was more than hugging; Defendant was feeling inside her panties. Mrs. Delaney told M.W. that M.W. needed to tell her mother. Mrs. Delaney did not know what else to say. M.W. was crying and seemed very upset. Mrs. Delaney explained that she did not want to believe that anything had been going on:

> I know that things go on like that. I didn't want to believe it because . . . I had been around the step-dad and, and he had treated, it seemed to me, treated her just like he did the other one, and he was the one that took care of them it looked like, cause I think [S.W.] was working in the daytime and he taking care of them, and [Elizabeth] had spent a lot of time over there and [Elizabeth] had not[] been in any type of dysfunctional situation going on. [']Cause then [sic], at that point, I asked [Elizabeth], I said did anything ever happen with you or has he ever done it and she said no, nothing.

Mrs. Delaney said she asked M.W. if she was doing this to break up Defendant and S.W.; M.W. replied she was not. Mrs. Delaney thought M.W. would want to break up Defendant and S.W., because M.W. did not like Defendant and because Defendant gave J.R. more attention. Mrs. Delaney also asked M.W. why she had not told her mother; M.W. responded that she was scared; Defendant had threatened to hurt her and her mother if she told. M.W. seemed genuinely upset.

Mrs. Delaney explained she told M.W. that she needed to go home in the morning and tell her mother. Two weeks passed, and M.W. still had not told her mother. In fact, M.W. acted like it had never happened. Mrs. Delaney questioned Elizabeth, and Elizabeth responded that M.W. refused to tell her mother and refused to speak about it. The next time M.W. was at the Delaney residence, Mrs. Delaney asked M.W. if she had told her mother, and M.W. answered she had not.

Mrs. Delaney then informed M.W. that Elizabeth would not be allowed to spend the night with M.W. until after M.W. had spoken with her mother about the allegations of abuse. Mrs. Delaney further informed M.W. that she had twenty-four hours to tell her mother. If M.W. did not tell her mother during that time, Mrs. Delaney would personally contact S.W. and explain the allegations M.W. had made.

Mrs. Delaney expressed her doubts about what had been going on. She thought that, if the allegations had been true, M.W. would not have been able to act as if nothing had happened during that two-week period and would not have been able to seemingly forget all about what had been said. Mrs. Delaney also thought that it was unlikely that something like that could go unnoticed by S.W., because S.W. was "so much hands on with the kids." Mrs. Delaney said Elizabeth had never told her that she had seen Defendant hug M.W. in a boyfriend-girlfriend manner.

M.W. was the prosecution's third witness. At the time of trial, M.W. was thirteen. M.W. lived with her mother, S.W., and her little half-sister, J.R. M.W. and J.R. had different fathers, but Defendant had, for all practical purposes, acted as M.W.'s father since she was "very little." M.W. was one or two years old when S.W. and Defendant began their relationship. At the time of trial, M.W. thought Defendant was "[f]orty-something." Defendant no longer lived with M.W.

M.W. said that Elizabeth was her best friend. M.W. recalled having a conversation with Elizabeth about something that made her uncomfortable. The conversation occurred when they were alone in Elizabeth's bedroom. M.W. had previously told Elizabeth that Defendant sexually assaulted her, and they were talking about it because Elizabeth was tired of seeing M.W. hurt. M.W. first told Elizabeth while they were out walking. During the first conversation about the

5

sexual abuse, M.W. told Elizabeth that Defendant had put his finger in M.W.'s vagina. This had happened a few months before the first conversation. M.W. told Elizabeth about all the instances where this activity had occurred. M.W. clearly recalled two occasions when this had happened. There had also been instances where Defendant would snuggle with M.W. She would feel uncomfortable, because she could feel his penis pressing against the back of her leg.

M.W. related that she told Elizabeth about an incident that occurred during the summer she was nine years old. M.W. had been lying down on the couch with Defendant. Defendant asked if she wanted to go play in the other room. She thought he meant to play wrestle, so she was confused when he brought her into the back bedroom, turned on the television, and laid down. M.W. laid down with Defendant, and he put his hand on her upper thigh. Defendant said "this" would make it easier before pushing her shorts and underwear down and inserting his finger inside M.W. Defendant did not say anything to M.W. while his hand was on her vagina. Defendant just moved his finger inside her vagina. M.W. felt violated. After about what seemed like five minutes, M.W. pushed Defendant's hand away, and told him that she did not want that. Afterward, Defendant got up and went into another room. Defendant was wearing jockey briefs, with no shirt; this was Defendant's usual mode of dress. Defendant instructed her not to tell what had happened.

M.W. remembered she also told Elizabeth about an incident that happened when her mother was in the hospital getting a hysterectomy in December of 2008 or 2009. At the time of the incident, M.W. was eleven. M.W. was home with J.R. and Defendant. S.W. had asked M.W. to stay next door with S.W.'s mother, but Defendant told M.W. she could not go because he had some work he needed her to

do. At the time, M.W. thought it weird because, after Defendant said he needed her to do chores, Defendant did not ask her to do anything.

M.W. explained that, during that time, the sky became dark because a storm was approaching. M.W. became "really scared" and did not want to sleep upstairs, so she went downstairs and prepared to sleep on the couch. M.W. frequently slept on the couch, however, Defendant told her he did not want her sleeping on the sofa. They heard a noise outside, and Defendant, dressed only in his underwear, grabbed a gun and ran outside yelling. At this point, M.W. was so frightened, she was trembling. Defendant, J.R., and M.W. all went to bed together with Defendant in the middle of the bed. M.W. said she got into bed with Defendant and J.R., because she was scared of the storm and the noises outside.

M.W. said that, because she remembered what had happened before, she tried to stay as close to the edge of the bed as possible, but Defendant pulled her back and snuggled her. M.W. was positioned so that she was on her side with her back to Defendant. M.W. planned to get out of the bed once Defendant fell asleep. M.W. did not feel safe in the bed because, J.R. was already asleep and on the other side of Defendant. M.W. tried to squirm away, but Defendant pulled her closer and told her that he thought this was what she wanted. When M.W. replied that, no, she did not want this, Defendant put his finger inside M.W. On that occasion, M.W. was wearing shorts and a tank top, which were her typical pajamas. M.W. began to cry. Defendant removed his finger and instructed her, "Don't tell, it will be our little secret." Defendant did not threaten her, but he had choked her on a prior occasion.

M.W. maintained that Elizabeth was the first person she told about these incidents, and she told Elizabeth about both times. M.W. did not go into detail when she revealed the activity to Elizabeth while they were walking. M.W. told

Elizabeth more detail when they discussed the matter at Elizabeth's house, but M.W. did not remember exactly what she said. Though Mrs. Delaney and Elizabeth encouraged her to tell her mother, M.W. delayed informing her mother about the incidents because M.W. was scared that her mother would not believe her or that her mother would not act immediately, thereby giving Defendant an opportunity to harm M.W again. After about a week, Elizabeth called M.W. and informed her that if M.W. did not tell S.W. then Elizabeth would. M.W. agreed to tell her mother, and she invited S.W. to walk to the mailbox with her. During the walk, M.W. told her mother what had been happening, and they both cried. S.W. took M.W. next door to the residence belonging to M.W.'s grandmother and contacted the police. The police came, and S.W. told them what M.W. had said.

M.W. said she did not meet with or speak to anyone about the incidents. However, M.W. remembered discussing the matter with Christy Pennison at the Rapides Parish Children's Advocacy Center (hereinafter "CAC"). M.W. was not sure what was going on, but S.W. told her that they were there so M.W. could tell them about what had happened. So, M.W. told Ms. Pennison about the incidents. Ms. Pennison told M.W. that the interview would be taped, so M.W. was aware that there was a video recording of the interview. M.W. was alone with Ms. Pennison during the interview.

When asked if Defendant did anything else that made her uncomfortable, M.W. said Defendant had choked her. M.W. also explained that, once a week or month, Defendant would twist her breast and say "tune in Tokyo" as if her breast were a radio knob. Defendant also called M.W. "Boobzilla." M.W. never gave her mother any clues about what had been happening. Whenever M.W. was not in school, she asked her mother if she could go to work with her. M.W. was afraid to stay alone with Defendant. Sometimes, S.W. would allow M.W. to accompany

her to work, but S.W. became frustrated with M.W. wanting to be there. If M.W. was not allowed to go to work with her mother, she tried to stay in her room. She sometimes went next door to her grandmother's home, but it would often be locked.

On re-direct examination, M.W. explained an incident when J.R. accused M.W. of choking her:

> [M]e and Robert [M.W.'s cousin] and [J.R.] were upstairs and we were playing this little perfume war thing, like you spray perfume on each other, and she accidentally sprayed herself in the eye. And she came downstairs and told [Defendant] that someone sprayed her in the eye or, she said Robert and me sprayed her in the eye. And then, she said I choked her. And, he made Robert walk home, and he lived a mile down the road, a half mile down the road. And then, he turns on me and he said I heard, [J.R.] told me that you choked her. I said I didn't choke her and he goes yeah, and he puts his hand around my neck and puts me to the door and says she said it felt like this. And, I was looking at her and [J.R.] was really scared and I was really scared too, and I said I didn't choke her, and then, I got kind of blurry after that. Then he turns me around and spanks me and throws me at the stairs.

Christy Pennison was the State's next witness. Ms. Pennison reported that, as part of her duties at the CAC, she interviewed M.W. on August 5, 2009, in relation to the allegations against Defendant. Ms. Pennison had been trained to question witnesses in a non-leading manner, and, to her knowledge, she did not ask M.W. any leading questions. Ms. Pennison explained that a child's answer to a question might be different if that question was asked again at a later date; it would not necessarily mean that the answer was inaccurate. The difference in the answers could depend on how comfortable the child felt at the time she answered the question.

Following cross-examination by the defense, the State played Ms. Pennison's recorded interview with M.W. for the jury. M.W. was twelve at the time of the interview. M.W. said she was there, because her mother's boyfriend touched her; she could only remember two out of four incidents. The first time

happened when M.W. was eight years old. M.W. said Defendant had lived with M.W. and her mother since M.W. was two years old, but he had recently moved out. Defendant liked to snuggle with M.W. and J.R. M.W. said she did not know the signs the Defendant was giving her. When Defendant asked her if she wanted to go in the bed and play, M.W. thought he meant to wrestle. Defendant turned on the television, lay down in the bed with M.W., pulled down her pants and underwear, and put his finger inside M.W's private part. M.W. related that, when Defendant put his finger inside her private, it moved. M.W. thought the signs she missed were Defendant putting his face in her hair and repeatedly "moving his hand up" despite the fact M.W. kept pushing his hand away. Those things made M.W. feel uncomfortable; it was the first time this had happened.

In the recording, M.W. related that the next time this happened was in December when her mother was in the hospital:

> My mom was in the hospital and we were laying down and there was a storm. And, we thought we heard knocking on the door. So, [Defendant] was in his underwear and he got a gun, and he walked outside and he jumped around cause he thought people were knocking on the door. And, I was scared cause I didn't know what was going on. And then, we [lay] down and my dog, Cinnamon, or my Nana's dog, Cinnamon, she was up on the door, and he told me to go let the dog in. I let the dog in, and then he, and then we [lay] down. And then, he snuggled up with me and I scooted away. And then, he snuggled up with me some more. And he says, "What's wrong?" I said, "I don't want this."
>
> . . . .
>
> He says, "You don't want this?" I said, "No. I don't want this." I said, "We've been through this four times." I said, "I don't want this." He says, "Okay. Well, just don't tell nobody. Okay?" I said, "All right." And then, he scooted over and then I just went to sleep.

Defendant did not touch her inappropriately that time.

During the recorded interview, M.W. explained she told her friend Elizabeth, who gave M.W. the courage to tell her mother. M.W. restated that Defendant did

not touch her anywhere inappropriate on the night of the storm. The night of the storm, M.W. was in bed with Defendant because she was frightened of the storm. M.W. usually tried to spend the night with her grandmother whenever S.W. was going to be away overnight, but Defendant had kept her from going to her grandmother's house on the basis that he had work for her to do, but she did not do any work that day. M.W. said that people were not supposed to touch her on her "boobs, butt, or private." She had not let anyone touch her "boobs."

S.W. was the State's fifth witness. S.W. had two children, M.W. and J.R. Defendant was J.R.'s father. S.W. and Defendant were together for eight years, and they lived together during that time. At the time of trial, Defendant was forty-five years old. At first, Defendant and M.W. had a good relationship. It changed after J.R. was born; Defendant showed J.R. a little more attention than he showed M.W. There was an incident where J.R. almost drowned while M.W. was inside watching television, while S.W. was lying down in bed, and while S.W.'s mother was minding the children. At the time, they were all next door at S.W.'s mother's residence; the pool belonged to S.W.'s mother. Defendant found J.R. in the pool and pulled her out. A helicopter then transported J.R. to the emergency room. J.R. was in the ICU, intensive care unit, for approximately two or three weeks; she was in the hospital for nearly a month. J.R. "coded" several times during that period, and she was on twenty-seven different medications.

S.W. said that the family dynamic changed when J.R. finally returned home. Defendant became very protective of J.R. and did not want her to go anywhere. One holiday, S.W. and Defendant fought because Defendant did not want J.R. going to S.W.'s mother's home for a family Thanksgiving. S.W. had to call the police because Defendant snatched up J.R. and was not letting her go; J.R. was

scared and crying. Defendant also blamed S.W. and M.W. for J.R. nearly drowning.

S.W. remembered that, on August 3, 2009, M.W. told her that Defendant had touched her. S.W. had suspected that something was going on prior to that date. M.W. did not want to be alone with Defendant. When M.W. was out of school, she would beg S.W. to allow her to accompany her to work. M.W. never stayed home on the weekends; she usually spent the weekends at S.W.'s mother's home. Towards the end, M.W. would stay in her room and not leave. M.W. would wait until Defendant and J.R. were asleep before she got something to eat from the kitchen. The possibility of sexual abuse crossed her mind, but she dismissed the thought. S.W. would not have remained in the relationship if she had known.

S.W. testified that, when M.W. revealed what had been going on during that walk to the mailbox, S.W. felt as though she should have known something had been happening, and she felt as though she should have already done something about the abuse. S.W. recalled all the times M.W. did not want to be left alone with Defendant and all the times S.W. had gotten angry with M.W. and had reprimanded M.W. for wanting to go with S.W. to work. S.W. asked M.W. why she had not told S.W. sooner, and M.W. replied that she had been scared to tell S.W. S.W. asked M.W. when the last incident of abuse had occurred, and M.W. responded that it had happened in December when S.W. was hospitalized for a hysterectomy. When S.W. asked M.W. how many times it had happened, M.W. said she thought it had happened four times, but she clearly remembered twice.

S.W. asked M.W. about why she could not clearly remember every time. M.W. explained about all the times Defendant would make her feel uncomfortable. Defendant would have M.W. lie down beside him, and he would hold her close, smell her hair, and tell her about how she smelled. Defendant did the same thing

12

to S.W. M.W. told S.W. more about the incident in December. M.W. explained that there was a storm, and she was scared, so, at Defendant's invitation, M.W. got into bed with Defendant and J.R. S.W. thought this was out of the ordinary, because Defendant did not let M.W. sleep in the bed with him and S.W., though J.R. slept there almost every night. M.W. reported to S.W. that, while M.W. was in bed with Defendant, he put his hand down M.W.'s pants, touched her, and instructed her not to tell. S.W. related that M.W. told her the first occasion happened when M.W. was nine years old. Defendant lured M.W. into the bedroom under the pretext of playing. Defendant then pulled down M.W.'s pants and touched her.

S.W. stated that, after M.W. initially told S.W. about the sexual activity, S.W. walked with M.W. to S.W.'s mother's house. Once there, S.W. called 9-1-1 and summoned the police. When the police arrived, they took S.W.'s statement and informed her that she needed to make a report at the police station the next morning. S.W. sent her niece's boyfriend next door to get her purse and medicine, but she eventually went home to get J.R. Once she had J.R., S.W. went back to her mother's house. When Defendant called to find out what was going on, S.W. told him that they were celebrating her niece's graduation from Northwestern State University by watching a movie and that they would stay overnight. The next morning, S.W. drove M.W. to the police station where they made a report. From there, S.W. took M.W. to the CAC and to the doctor for an examination. Other than telling M.W. to tell the truth, she did not discuss with M.W. what M.W.'s testimony would be.

S.W. said that, on three prior occasions, she had asked Defendant to leave her home, and he had refused to go. However, she never did so in front of the children, because she did not believe in arguing in front of them. S.W. also would

not use her child to make Defendant leave, because it was S.W.'s role to stand up for her children and protect them. The police escorted Defendant from her home on August 4, 2009.

S.W. explained that Defendant liked to have her hold up his arms while he pinched her nipples and said "tune in Tokyo." She did not know if M.W. had ever seen Defendant do that to S.W., but she knew that Defendant did it to M.W. on at least one occasion. S.W. told Defendant that it was not appropriate behavior. Defendant also talked about M.W.'s breasts. Defendant mentioned that M.W.'s breasts were bursting out of her shirt and made other comments S.W. thought inappropriate. S.W. had a lot of discussion with Defendant concerning this, his habit of being in his underwear all the time, and comments he would make about women in general.

On cross-examination, S.W. said that she used to take Ambien at night to help her sleep, because she could not rest, as she always wondered when Defendant "was going to slide something on [her] next, for sexual intercourse at night that [she] did not want to partake in." She stopped taking the Ambien when Defendant threatened her and M.W. She was not on Ambien when J.R. nearly drowned; she only took the Ambien in the evenings. She was sick and feverish, so her mother was watching the children at that time. S.W. agreed that Defendant said he believed M.W. had pushed J.R. into the pool.

S.W. denied using the threat of child abuse charges to win disputes over how to raise the children. S.W. stated that, instead, whenever she tried to get him to leave, she always assured Defendant that he would be able to see J.R. S.W. thought having a father figure was important, so she would not deny J.R. her ability to see her father.

14

Jason Chelette was the prosecution's final witness. Between 2000 and 2010, Mr. Chelette was employed by the Grant Parish Sheriff's Office as a detective. On August 3, 2009, Sergeant Wooten, also of the Grant Parish Sheriff's Office, contacted Mr. Chelette and requested his assistance with a possible molestation charge. Deputies Bonner and Ussery took the initial report and turned the case over to Mr. Chelette.

Mr. Chelette said he went to S.W.'s home to speak with Defendant, who was there alone. Mr. Ray Cooper, a child welfare specialist, and a uniformed deputy, Jeff Price, accompanied Mr. Chelette to the house. They could see Defendant in the house through a set of French doors, and after knocking several times, they were able to awaken him. Defendant, dazed like he was still in a deep sleep, answered the door while wearing a towel. Mr. Chelette identified himself, Mr. Cooper, and Deputy Price. Mr. Cooper then informed Defendant that they were there to investigate a possible child molestation. Defendant told them his name, invited the men inside, and said he knew why they were there. At this point, no one had mentioned any details of the allegations.

Mr. Chelette recalled that, without being asked any questions and without being informed of the details of the allegations against him, Defendant began talking about a storm, about having his hand in M.W.'s crotch, and about jumping and hollering for S.W. Before that point, Mr. Chelette, himself, had not known the details of the allegations other than the child had complained of being touched. Defendant then said something about the back porch, about looking for someone outside, and about a gun. To Mr. Chelette, the conversation seemed free and voluntary; Defendant never asked them to leave. Defendant talked while Mr. Chelette, Mr. Cooper, and Deputy Price listened.

15

Mr. Chelette remembered that they asked Defendant if he would voluntarily submit to a drug test, and Defendant agreed to go with them. Defendant was not under arrest at that time, they were just investigating at that point. People did not usually volunteer information without being questioned. Mr. Chelette was shocked. Defendant told them that, on a stormy night, he got the girls from upstairs and had them get into the bed in the master bedroom. Defendant then said that, when he woke up, he had his hand in M.W.'s crotch. Defendant yelled for S.W., but she was not there.

On cross-examination, Mr. Chelette related that he did not retain a copy of Defendant's written statement; it remained with the file. Mr. Chelette volunteered to provide Defendant with a copy of the statement in the file. Mr. Chelette told Defendant that he was being accused of a possible molestation when he, Mr. Cooper and Mr. Price informed Defendant of the reason for their visit. Mr. Chelette did not Mirandize Defendant.

Defendant called Chris Peart, Defendant's mother, as its first witness. Ms. Peart worked at the Rapides Parish Sheriff's Department as a detention supervisor over dietary, laundry, and sometimes the front office. Because her son used to live with them, Ms. Peart was familiar with S.W., M.W., and J.R. Ms. Peart saw her granddaughter, J.R., three times a week. She testified that Defendant had two daughters and loved them both. From her experience with M.W. and J.R., their relationship was a tug-of-war because of jealousy.

Finally, Defendant testified in his own defense. At the time of trial, Defendant was forty-three. Defendant had a tenth grade education and worked as a drummer; he worked in a lot of bands because he was good. Defendant explained that he did not leave when S.W. told him to go because he was afraid for his

16

daughter. Defendant denied ever putting his hand in M.W.'s underwear. He also denied ever touching her nipple.

On cross-examination, Defendant said he had two daughters. He had written a statement to Mr. Chelette regarding an incident where he had refused to allow M.W. and Elizabeth to cook macaroni and cheese in the kitchen while he was in the interview room at the sheriff's office. Regarding the time that Mr. Chelette went to his house, Defendant remembered:

> It was the uniformed officer and the guy from OCS [Office of Child Services].
>
> . . . .
>
> And, they knocked on the back door, it took a while, I did not - - cause I thought the kids were playing. I finally saw who it was, so I got up and let them in, and they introduced themselves. And, they said is there a place we can sit down, so we went to the table in the back in the kitchen. . . .
>
> . . . .
>
> Okay. So, he said we're here concerning an allegation made by [M.W.] that you touched her sexually. And, I was like "what the . . ." And, Mr. Cooper started asking about my other daughter and, you know, it looked like, you know, I couldn't answer this one's question fast enough before this one's shooting me and I got this uniformed cat breathing down my neck. . . .

Defendant denied telling the men about a stormy night. Defendant asserted that Mr. Cooper brought up the stormy night by saying M.W. had complained of something happening on a stormy night. Defendant said they misconstrued his comment about him having his hands down M.W.'s pants because J.R. almost drowned; the men confused the two incidents. Defendant advanced that he had told the officers that, on a night when J.R. was stable in the hospital, he returned home for the evening. That night, he went to bed and awoke to find M.W. had wrapped her arms and legs around one of his arms. He screamed for S.W., reprimanded M.W. for grabbing him in his sleep, and sent M.W. to bed in her own

17

room.  S.W. was at the hospital with J.R.  Defendant again denied saying anything about an incident when S.W. was in the hospital on a stormy December night.

Defendant testified that "tune in Tokyo" was a joke between him and Robert.  He had done it to S.W., but he never did it to M.W.  Defendant said he never commented on M.W.'s breasts; he remarked that a padded bra that S.W. had bought M.W. "made her look like she had the same set her momma had."  Defendant denied ever choking M.W.  He said he put his hands around M.W.'s throat because J.R. told him M.W. had choked her.  Defendant also denied frequently walking around the house in his underpants.

Defendant said Mr. Chelette's testimony was not very truthful because they made him collect his things and vacate S.W.'s house.  Defendant did not feel he had the option of instructing the officers to leave.

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record.  After reviewing the record, we find no errors patent.

## ASSIGNMENT OF ERROR NO. 1:

Defendant challenges sufficiency of the evidence by claiming the victim was not credible:

> The evidence was insufficient to convict S.R. of Count 2 because the victim's testimony as to the facts surrounding that offense is internally inconsistent.  Additionally, these internal inconsistencies as well as other testimony at trial calls into question the credibility of the victim's accusations as to the first alleged incident of sexual assault.  Thus, the evidence was insufficient to convict S.R. of the first alleged sexual assault as well.

Defendant asserts that the victim's testimony wavered about what events occurred in relation to the second count of indecent behavior.  At one point, the victim said

18

Defendant only put his hand on her hip; at another point, the victim said Defendant put his finger inside her. Defendant contends that this inconsistency creates reasonable doubt regarding his conviction for the second count, and that doubt, in turn, creates reasonable doubt about his conviction for count one, as well.

Defendant asserts that the jury should have believed Mrs. Delaney instead of M.W. Mrs. Delaney testified that she did not believe M.W., because Defendant did not seem like the type to do such things and because M.W. was jealous of the attention Defendant gave her sister. Mrs. Delaney also suspected that M.W. was making up the allegations to break up Defendant and her mother.

The Louisiana Supreme Court has discussed the standard of review for evaluating the sufficiency of the evidence on appeal:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. A reviewing court may impinge on the fact[-]finding function of the jury only to the extent necessary to assure the *Jackson* standard of review. It is not the function of an appellate court to assess credibility or re-weigh the evidence.

*State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86 (citations omitted).

Defendant does not allege that the prosecution failed to present proof of each element of the alleged offenses: two counts of indecent behavior with juveniles. Instead, he urges that the jury erred in finding M.W. to be a credible witness based on her failure, on one occasion, to say, regarding the later incident, that Defendant inserted his finger into her vagina:

> [The supreme court has] repeatedly cautioned that due process, rational fact finder test of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct.

19

2781, 61 L.Ed.2d 560 (1979), does not permit a reviewing court to substitute its own appreciation of the evidence for that of the fact finder or to second guess the credibility determinations of the fact finder necessary to render an honest verdict. A reviewing court may intrude on the plenary discretion of the fact finder "only to the extent necessary to guarantee the fundamental protection of due process of law."

*State v. Calloway*, 07-2306, p. 10 (La. 1/21/09), 1 So.3d 417, 422 (citations omitted). "The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness[.]" *State v. Higgins*, 03-1980, p. 17 (La. 4/1/05), 898 So.2d 1219, 1232, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005). "Credibility determinations are within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, *cert. denied*, 552 U.S. 905, 128 S.Ct. 239 (2007).

In the case at hand, there was only one instance where M.W.'s prior statements deviated from her trial testimony. During M.W.'s CAC interview, M.W. did not say that Defendant put his finger into her private part. Ms. Pennison, the CAC interviewer, explained that discrepancies were possible because what a child may say during such interviews depended on the child's comfort level. The jury was provided an opportunity to watch the CAC interview and, thereby, observe M.W.'s demeanor during the interview and compare it to M.W.'s demeanor during trial, which occurred after M.W. had benefitted from counseling she received after the CAC interview. Thus, the jury may have reasonably attributed the difference in the two accounts to M.W.'s discomfort during the CAC interview.

Insofar as Mrs. Delaney's disbelief in the allegations, Mrs. Delaney made it clear at trial that she did not want to believe M.W.'s allegations, but she agreed that M.W. was genuinely upset when she related the details of Defendant's sexual

20

misconduct. Furthermore, Defendant's attempts to gain the jury's sympathy by introducing testimony that Defendant thought M.W. deliberately attempted to drown J.R., that Defendant had been told M.W. choked her younger sister, and that M.W. may have fabricated these allegations to make Defendant leave the home were apparently unsuccessful.

Defendant, himself, struggled with credibility issues. Defendant had previously made a statement against his penal interest to Mr. Chelette. In this statement, Defendant admitted to a different version of facts during the stormy December night incident. In this different version, Defendant advanced that he had inadvertently fondled M.W.'s vagina while he was sleeping. At trial, Defendant asserted his complete innocence of all charges, denied making the prior statement, and claimed Mr. Chelette either lied about or misunderstood what Defendant had told him. As with M.W., the jury had the opportunity to observe both Defendant's and Mr. Chelette's demeanors at trial, compare them, and make a credibility call based on that comparison.

As evidenced by the unanimous verdict, the jury clearly believed M.W. and Mr. Chelette and disbelieved Defendant. Based on the information contained in the record, the jury's credibility determination is not clearly contrary to the evidence.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2:

Defendant argues that the trial court erred in allowing the State to admit into evidence a statement Defendant made against his penal interest:

> The trial court erred in admitting a statement made by S.R. when the statement was made without *Miranda* warnings and was made as a result of S.R. being confronted at his residence by two police officers and an OCS [Office of Child Services] worker, at

21

which time S.R. was the focus of an investigation of alleged sexual abuse.

Defendant claims that the evidence should have been excluded, because some type of interrogation must have occurred before he gave his statement, because Defendant did not feel free to ask the investigators to leave, because the investigators did not tell Defendant he was not under arrest and that he was free to leave, and because the investigators asked Defendant to accompany them for a drug test after the "interrogation." Defendant further protests that the introduction of the statement was not harmless error, because it bolstered the credibility of the victim's inconsistent testimony. After jury selection, but before trial, the prosecution moved to have the district court rule on the admissibility of Defendant's prior statement.

Mr. Chelette revealed that he brought Mr. Cooper from OCS and Deputy Price, a uniformed officer, to Defendant's residence. The group went to Defendant's residence to investigate a possible molestation. At the residence, the men knocked on the front door before walking around back and seeing through French doors a man in bed. So, the men continued knocking until that man got up and answered the door. Mr. Cooper identified himself and stated that he worked for OCS. Then, Defendant, Mr. Chelette, and Deputy Price introduced themselves. Mr. Chelette informed Defendant of the purpose for their visit, which was the investigation of a possible child molestation. At that time, Defendant began speaking before the three officers had an opportunity to ask questions. Mr. Chelette did not advise Defendant of his *Miranda* rights, and Defendant was not under any duress.

Mr. Chelette related that Defendant volunteered the following information:

He started telling me about "y'all are here for the storm[,]" and then he went onto a story about, I don't even know the little girl's name

22

exactly, about his hand being in her crotch and storm, and this, and that, and the other, and just went on talking about it. And he said, "that's what y'all here for, right?"

Other than saying that the allegations had been made by M.W., Mr. Chelette did not give Defendant a date or a description of the events that made up the allegation. Mr. Chelette did not interrupt; he just listened as Defendant spoke. Defendant never indicated that he wanted to stop talking or that he wanted a lawyer. Mr. Chelette did not at any time place Defendant under arrest. Defendant did not ask them to leave. Defendant voluntarily accompanied them when they asked him to submit to a drug test. Defendant was free to leave and free to ask them to leave at any point.

On cross-examination, Mr. Chelette said that, from Sergeant Wooten's report and an earlier discussion with S.W. and M.W., he knew the accusations against Defendant involved the allegation that Defendant put his hands in M.W.'s pants. Defendant did not tell Mr. Chelette about any sort of family dispute:

> No, sir, not at all. I mean, like I told Mrs. Dugas [the prosecutor], when I knocked on the door several times, he was in bed, he got out of the bed, and we introduced who we [were],what we [were] doing there, and he told us to come on in because we went through the bedroom first. We went around to a kitchen area, [sat] at the table, and he started speaking and saying I know what y'all doing here[sic]. I mean, . . . he told us it was a stormy night, [S.W.] was having surgery. I can only say what he told me, sir.

Mr. Chelette had informed Defendant that he was being investigated for possibly molesting a juvenile. Mr. Chelette did not read Defendant his *Miranda* rights.

At the hearing, the prosecution urged that *Miranda* rights were not at issue in the present case, because the exchange did not constitute an interrogation, and because Defendant was not in custody at the time. Instead, the issue was whether what Defendant "blurted out" was free and voluntary. The defense rejoined that, as Defendant was the focus of the investigation, the statement should be stricken

23

based on the officers' failure to Mirandize Defendant. The trial court then ruled the statement to be admissible.

At the time he made the statement, Defendant was neither in custody nor being interrogated. Defendant had not been formally arrested, and his freedom had not been curtailed in any way that would make him believe he was restricted from leaving or asking the officers to leave. Moreover, there was no interrogation as Defendant made the statement before the officers had an opportunity to ask any questions about the matter at hand. Therefore, the *Miranda* warning did not apply in the instant case.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 3:

Defendant asks this court to review an evidentiary objection for the first time on appeal because "the error substantially undermines the reliability of the fact finding process":

> M.W.'s mother was erroneously allowed to testify regarding what M.W. told her about the alleged sexual assaults. The statements made by M.W. to her mother were not the initial complaint of the sexually assaultive behavior; and, thus were inadmissible hearsay statements. Trial counsel's failure to object to the testimony should not preclude this Court's review of the error since the error substantially undermines the reliability of the fact-finding process in this case.

Defendant contends that this evidence should have been excluded because it did not constitute the initial report of sexually assaultive behavior under La.Code Evid. art. 801(D)(1)(d).

Defendant asserts that this court should review this complaint for the first time on appeal because the "error is so fundamental that it calls into question the reliability of the fact-finding process" under *State v. Prince*, 520 So.2d 778, 783 (La.App. 3 Cir. 1987), *writ denied*, 522 So.2d 567 (La.1988).

24

This assignment of error is meritless. Though the statement M.W. made to her mother was not a first report of sexual abuse, the statement was not hearsay if it complied with La.Code Evid. art. 801(D). Under La.Code Evid. art. 801(D)(1)(b), the evidence would not be hearsay if submitted as a prior consistent statement:

> **D. Statements which are not hearsay.** A statement is not hearsay if:
>
> **(1) Prior statement by witness.** The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
>
> . . . .
>
> (b) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive[.]

Clearly, in the instant case, the his theory of defense included the implication or direct charge that M.W. fabricated the accusations to break up S.W. and Defendant and to get Defendant out of the home. S.W. testified after M.W. had already testified and had been subjected to cross-examination, and S.W.'s testimony about M.W.'s revelation and the details thereof were consistent with M.W.'s testimony at trial. Thus, the evidence was admissible as a prior consistent statement.

Defendant does not claim that S.W.'s testimony conflicted with M.W.'s trial testimony; instead, Defendant urges that S.W.'s testimony about what M.W. told her bolstered the credibility of M.W.'s trial testimony. Thus, Defendant does not contend that S.W.'s testimony was not admissible as a prior consistent statement.

Accordingly, this claim is also without merit.

## ASSIGNMENT OF ERROR NO. 4:

Defendant urges that the district court erred in refusing to replace a juror biased toward the victim:

The trial court erred in refusing to remove a juror and replace her with the alternate when that juror informed the trial judge prior to the start of testimony that the juror's daughter went to school with the victim and had the victim over to her house on a prior occasion.

Defendant points out that, prior to the State's first witness, Juror Tammy Allen informed the trial court that, when the victim entered the courtroom, she recognized her as someone she knew. Juror Allen's daughter was acquainted with the victim, and the victim had been to Juror Allen's house. Defendant maintains that, due to this knowledge of the victim, Juror Allen should not have been allowed to serve on the jury under La.Code Crim.P. art. 789. Defendant professes that, had this issue arisen before the jury was sworn, the he would have challenged Juror Allen for cause and, subsequently, would have used a peremptory challenge had the challenge for cause been unsuccessful.

At the conclusion of opening statements, Juror Allen made the trial court aware that she recognized the victim. Once the jury is sworn, a juror may only be replaced if they become disqualified or if they become physically unable to perform their duties:

> The court may direct that not more than six jurors in addition to the regular panel be called and impaneled to sit as alternate jurors. Alternate jurors, in the order in which they are called, shall replace jurors who become unable to perform or disqualified from performing their duties. . . .

La.Code Crim.P. art. 789(A).[2]

In a fifth circuit case, the defense assigned error to the trial court's refusal to replace a juror, who after hearing three witnesses, remarked to the bailiff, "'[w]e can wrap this up early, you know, I've pretty much seen enough.'" *State v. Packnett*, 04-709, p. 14 (La.App. 5 Cir. 12/28/04), 892 So.2d 615, 624, *writ denied*, 05-599 (La. 6/3/05), 903 So.2d 455. The bailiff reported the remark to the trial

---

[2] For an in-depth discussion and a historical retrospective of the jurisprudence interpreting this article, see *State v. Tennors*, 05-538 (La.App. 3 Cir. 2/15/06), 923 So.2d 823.

court, and the district court conducted a hearing to determine whether the juror had become disqualified. *Id.* During the hearing, the juror stated that he had not actually formed an opinion as to the defendant's guilt or innocence and maintained that he could keep an open mind, listen to all of the evidence, and wait to deliberate until all of the evidence had been presented. *Id.* Finding no bias on the juror's behalf and no violation of his oath as a juror, the trial court denied the motions for juror replacement and mistrial. *Id.* The fifth circuit found no abuse of discretion:

> A trial judge may disqualify a juror upon a finding of blatant prejudices and partiality.
>
> In the present case, the judge acted properly in holding an evidentiary hearing, with all parties present, to determine the existence of a violation of the judge's order, the nature and extent of the violation, and the appropriate solution to the problem. Juror Wollforth's answers to the trial judge's questions indicated that he could be a fair and impartial juror, and that he had not shared his remark with other jurors. If Juror Wollforth had given the trial judge some indication that he could not be impartial, perhaps the trial judge would have replaced him . . . . We find the trial judge did not abuse his discretion in refusing to replace Juror Wollforth with an alternate juror.

*Id.* (citations omitted).

In a first circuit case, the defense assigned error to the trial court's refusal to replace a juror who, at trial, the defendant had requested to be replaced based on an alleged acquaintance with the victim's family. *State v. Ducksworth*, (La.App. 1 Cir. 1986) 496 So.2d 624. The defendant based his objection upon seeing Juror Davenport's mother sitting near a person in the courtroom identified as the victim's aunt. *Id.* The trial court conducted a hearing on the matter, and Juror Davenport stated that she was not acquainted with any member of the victim's family and maintained that she "was able to perform her duties as a juror fairly and impartially." *Id.* at 635. The first circuit found no error in the trial court's refusal

27

to replace Juror Davenport because the record did not support a finding of legal cause to support such a replacement. *Id.*

As in *Packnett* and *Ducksworth*, the juror in the instant case, Juror Allen, maintained that she could be fair and impartial. Furthermore, Juror Allen stated that she only knew M.W. as an acquaintance of her daughter who had once briefly visited with Juror Allen's daughter at the Allen residence. Juror Allen did not have a clear recollection of the visit and, therefore, could not remember whether M.W.'s visit had been overnight. Nothing Juror Allen said at the hearing indicated anything more than a passing acquaintance between Juror Allen and M.W. or that the relationship between M.W. and Juror Allen's daughter would cause Juror Allen bias.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 5:

Defendant contends, "[t]he trial court's imposition of maximum sentences was constitutionally excessive." Defendant maintains that he is not the worst type of offender as shown by his absence of a criminal record, his steady employment, and the abundant support by his friends and family. Defendant also advances that his sentences should have been more lenient because the victim's accusations against Defendant were inconsistent.

Defendant appeared for sentencing on June 23, 2011. The sentencing court explained to Defendant that it had considered the pre-sentence investigation report created in reference to Defendant's case as well as "numerous letters from friends, family, and co-workers, expressing their opinion of [Defendant's] innocence" and requesting leniency in regard to Defendant's sentencing.

S.W. gave a victim impact statement at the sentencing. S.W. explained that both M.W. and J.R. had been affected by Defendant's behavior, because J.R. had

been denied her father. S.W. pointed out that J.R. was, at the time of the hearing, the same age M.W. had been when Defendant began to abuse her. S.W. was concerned because Dr. Seminoux had informed her that there was no evidence a child molester would refrain from touching his biological children. After counseling, J.R. had admitted to seeing the abuse in the family though she did not know that Defendant had been accused of being a sex offender.

S.W. explained that she admired M.W. for having the strength to report the abuse, and she expressed her guilt over not ending her relationship with Defendant before M.W. was abused. S.W. advanced that she worried about how, as a result of these offenses, M.W. would perceive men and whether M.W. would make decisions based on the destruction of M.W.'s trust, innocence, and childhood. S.W. asserted that, no matter what sentence Defendant received, M.W. would have to live with the memories and the consequences for the rest of her life. S.W. pointed out that the destructive nature of Defendant's actions was amplified, because Defendant was the only father figure in M.W.'s life.

S.W. pointed out that, despite the unanimous verdict in the case, Defendant continued to maintain his innocence, had expressed no remorse, and had made no changes in his life. S.W. accused Defendant of being a habitual liar who continued his attempts to deceive the district court. S.W. asserted that Defendant was manipulative and abusive. She insisted that Defendant would not change; he would continue to lie about things not even related to the case. S.W. then concluded her statement by asking the sentencing court to give her and her children justice and to impose a sentence fitting for the crimes committed.

Defendant then used his opportunity to speak:

On the matter with Mr. Whatley, Judge, I tried to call him back three times with questions I had pertaining to responsibilities I had to follow up on, and I wasn't afforded a courtesy call back, on three

29

separate occasions, is why a few things were left out. But, I never hid anything from anybody. I've sent you documents and a restraining order, things that have been denied that people had, you know, made accusations about me, but, I'm maintaining my innocence in this matter. I've been accused and convicted of a crime with no evidence to support the claims made against me. This is a travesty of justice, in the worse [sic] way. I've been a professional musician for 29 years. I've been painted a monster, by [S.W.] and Tammy Gaullier, in a pre-sentencing report to Agent Whatley, with no documentation to prove the allegations made against me. In my defense, anybody can say anything about anybody at anytime to try to discredit their character. I've been labeled "living a hardcore lifestyle." I would hardly call taking care of my children during the week and working on the weekends with Rapides Parish Sheriff Deputy Wes Procell's band at Tunk's Cypress Inn; at Spirit's Eatery; JJ's in Natchez, Louisiana; the Cherokee Club in Campti, and the Alexandria Golf and Country Club with Rod Baronet, as living a hardcore lifestyle. I have done things that I'm not proud of in my past, but, that was almost two decades ago. Since my children have been born, all I've done was try to be instrumental in raising them. It seems as if when they reach an old enough age you're [sic] services aren't required anymore. I've kept my work life and my home life separate from each other, not trying to bring bad influences into the home, into my children's lives. At no time have I ever kept locations secret from my significant others. At best, I would ask them to tell others where my band was playing in order to build somewhat of a crowd for the evening. I have two daughters of my own and would never shame them or myself by committing such heinous acts toward a juvenile. How a charge of such serious matter can stick with no evidence is beyond me. Allegations made against me clearly should have had medical evidence to support testimony given by the prosecution's so-called victim. I am seeking no type of revenge, nor do I want anything wrong done to my accusers. All I wanted was to clear my name of any wrongdoing. What I was up against was people on a jury panel that were hearing instead of listening; there's a difference between the two. How does one defend themselves against such a claim? I'm sure it's easy to say that I've been found guilty by a jury of my own peers, when in fact, the peers that I wanted were challenged and caused right out the courtroom door. . . .

The sentencing court then stated its reasons and imposed Defendant's

penalties:

[S.R.], the Court has carefully studied the pre-sentence report, noting your lack of criminal history, as well as the aggravating and mitigating circumstances that have been presented in this case, the Court has considered these, in light of the provisions set forth in Criminal Code Article 894.1, which sets forth standards for the Court to consider in imposing sentence. The Court notes that [S.R.] has historically been self-employed as a drummer in various bands. He

30

had recently supplemented his income by working part-time at Red River Music in Alexandria. He is currently 44 years old and reports that he has never been married, but, that he has had three significant relationships, the most recent having been with [S.W.], the mother of his child, as well as the mother of the alleged victim. Both, the pre-sentencing investigation and [S.R.] have indicated today that he has another child. The Court notes that the pre-sentence investigation indicates that [S.R.] does not support either one. The pre-sentence investigation also indicates that all three women have claimed that [S.R.] was physically abusive to them and that their relationships ended with restraining orders. The Court will note that [S.R.] provided, in one of his documents, the dismissal of a restraining order.

. . . .

BY THE COURT: Furthermore, the pre-sentence investigation indicates that [S.R.] was historically a habitual user of meth-amphetamines. At the time of the report, he denied being addicted to the substance. [S.R.], count two of what you were convicted requires a minimum two[-]year hard labor sentence. I understand that both, you and your family, have been seeking leniency from this Court; however, sir, you were found guilty of an offense that requires a jail sentence. Notwithstanding the fact that you have no prior convictions and that many of your family and friends support your innocen[c]e, there are aggravating factors which warrant imprisonment. [S.R.], this Court believes that you have a history of perpetrating abuse on women, of which, you completely deny. Your denial of any abuse along with your denial of any wrongdoing in this case concerns the Court that there is an undue risk that you will commit another offense in the future. Furthermore, a sentence of imprisonment is necessary given the seriousness of the offense, and that the activity was repeated on the same victim. Therefore, the sentence which I impose on you is as follows: For each count, seven years at hard labor with the Department of Corrections at such institution they may designate. That sentence[s] [are] to run concurrent[ly] with each other. As to count two, the first two years of that sentence will be without the benefit of parole, probation, or suspension of sentence. . . . You are given credit for any time that you have served. Your sentence has not been enhanced pursuant to provisions of Louisiana Revised Statute 15[:]529.1, or Code of Criminal Procedure Article 8913.1 [sic], or any other provision of law. Your sentence is not entitled to diminution for good behavior, under the provisions of Revised Statute 15[:]571.3 (C) (4) [(B) (3) (l)] and 15[:5]37 (A). . . .

On July 11, 2011, Defendant filed a motion to reconsider sentence with the district court. In his motion, he asked the trial court to reduce Defendant's sentences to the statutory minimum on the following bases: (1) Defendant was a forty-four-year-old white male with two minor children; (2) Defendant lived with

31

his mother, his stepfather, his sister, and her child prior to his sentencing; (3) Defendant had no prior convictions; (4) Defendant had steady employment on weekdays as a piano mover and on weekends as a musician in a band with Sheriff's Deputy Wes Procell; (5) the pre-sentence investigation contained incomplete, false, and misleading information; (6) the pre-sentence investigation omitted witness statements that would have revealed the bias of the prosecution's witnesses; (7) M.W. was motivated to fabricate false allegations against Defendant by her desire to remove Defendant from S.W.'s house; and (8) Defendant was factually innocent of the offenses, and his guilt was not supported by the evidence.

The sentencing court conducted a reconsideration hearing on August 11, 2011. After finding that the evidence Defendant tried to submit at the hearing (printouts of screen images purportedly belonging to S.W.'s and M.W.'s facebook accounts) was not pertinent to sentencing, that the defense failed to establish a foundation for the admission thereof, and that there were no grounds for reconsideration, the district court denied Defendant's motion.

Prior to August 2006, the sentencing range for indecent behavior with juveniles was zero to seven years with or without hard labor:

> C. Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.

La.R.S. 14:81 as last amended by 1997 La. Acts No. 743, § 1. This earlier sentencing provision is relevant for the conviction on count one, which was based on the event that occurred in 2005 when M.W. was nine. Thus, Defendant received the maximum possible term of confinement for count one.

Because count two occurred in December 2008, the sentencing range for indecent behavior with juveniles depended on the age of the victim and the perpetrator:

> H. (1) Whoever commits the crime of indecent behavior with juveniles shall be fined not more than five thousand dollars, or imprisoned with or without hard labor for not more than seven years, or both, provided that the defendant shall not be eligible to have his conviction set aside or his prosecution dismissed in accordance with the provisions of Code of Criminal Procedure Article 893.

> (2) Whoever commits the crime of indecent behavior with juveniles on a victim under the age of thirteen when the offender is seventeen years of age or older, shall be punished by imprisonment at hard labor for not less than two nor more than twenty-five years. At least two years of the sentence imposed shall be served without benefit of parole, probation, or suspension of sentence.

La.R.S. 14:81 as last amended by 2006 La. Acts No. 103, § 1 and No. 224. § 1. As the jury found that M.W. was under the age of thirteen and Defendant was over the age of seventeen in December 2008, the relevant sentencing range for Defendant's second conviction is two to twenty-five years at hard labor. Therefore, though Defendant received the same sentence for the second conviction, it constituted a low-range penalty.

This court has previously discussed the standard for reviewing excessive sentence claims:

> [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate.

> > *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042, *writ denied*, 01-838 (La.2/1/02), 808 So.2d 331 (citations omitted)(second alteration in original).

> > > In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case."

> > *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789,*writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061 (citations omitted). "[T]he trial judge need not articulate every aggravating and mitigating circumstance outlined in art. 894.1[;] the record must reflect that he adequately considered these guidelines in particularizing the sentence to the defendant." *State v. Smith*, 433 So.2d 688, 698 (La.1983).

*State v. Batiste*, 09-521, p. 3 (La.App. 3 Cir. 12/9/09), 25 So.3d 981, 983 (alterations in original). "'[M]aximum sentences are reserved for cases involving the most serious violations of the charged offense and for the worst kind of offender.' . . . [T]he maximum sentence can be imposed in cases involving either the worst type of offender or the most serious . . . offense." *State v. Jacobs*, 11-363, p. 23 (La.App. 3 Cir. 10/5/11), 74 So.3d 884, 899 (citations omitted) (first alteration in original).

In the instant case, the district court considered the aggravating and mitigating factors. These factors included Defendant's relative lack of a criminal history, Defendant's history of self-employment, his recent effort to obtain a steady income by working part-time at a music store, Defendant's age, his relationship

status, Defendant's history of physically abusing the women in his relationships, the fact that all of Defendant's significant relationships ended with restraining orders against him, Defendant's denial of that abuse, Defendant's refusal to help support his two children, Defendant's drug addiction and habitual use of methamphetamines, Defendant's refusal to admit his addiction, the support of Defendant's family and friends, Defendant's refusal to admit any wrongdoing in the instant case, the undue risk that Defendant would commit another offense in the future, the seriousness of the offense, and the fact that Defendant repeated the sexual activity on the same victim. In the instant case, the district court did not deny Defendant good time diminution of sentence; diminution was prohibited by law. La.R.S. 15:571.3(B)(3)(l); La.R.S. 15:537(A).

The sentencing court adequately considered the aggravating and mitigating factors in the instant case. The record in the instant case shows that Defendant abused his position as a caretaker or household authority figure to entice his daughter's nine-year-old half-sister into his bed with the pretext of play, to remove her clothing, to insert his finger into the child's vagina, and to move the finger around in an attempt to stimulate some sort of reaction. Therefore, the trial court, in this case, did not err in imposing the maximum possible sentence on count one.

Defendant's arguments of excessiveness are also directed at the seven-year sentence he received for the 2008 offense. Given the facts of this case, the aggravating and mitigating circumstances discussed by the district court, plus the fact that seven years is less than one-third the maximum possible penalty, the sentence for count two does not shock this court's sense of justice. We also disagree with the Defendant's contention that his sentencing on court two makes no measurable contribution to acceptable penal goals.

Accordingly, this assignment of error is without merit.

**DECREE:**

Defendant's convictions and sentences are affirmed.

This opinion is NOT DESIGNATED FOR PUBLICATION. Uniform Rules– Courts of Appeal, Rule 2–16.3.